**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GABRIELLE DEARDORFF, BRYAN | : | |
| OTERI, CAROLINE & CO MEDIA LLC, | : | |
| d/b/a SAVVY MAIN LINE, | : | |
| MONICA D'ANTONIO, ELAINE | : | |
| HANNOCK, KAREN HAYMAN, | : | |
| ZAK HUTCHINSON, and ELIZABETH C. | : | |
| BROOKS, | : | NO. |
| | : | |
| *Plaintiffs* | : | |
| v. | : | |
| | : | |
| JOSEPH C. GALE, Individually and in | : | |
| His Official Capacity as Commissioner of | : | |
| Montgomery County, PA; and FRIENDS | : | |
| OF JOE GALE, | : | |
| *Defendants* | : | |

## COMPLAINT

COME NOW, Plaintiffs Gabrielle Deardorff, Bryan Oteri, Caroline & Co Media LLC d/b/a

SAVVY Mainline LLC, Monica D'Antonio, Elaine Hannock, Karen Hayman, Zak Hutchinson,

and Elizabeth C. Brooks and state as their Complaint for Relief:

## INTRODUCTION

1.      Defendant Joseph C. Gale ("Gale" or "Commissioner Gale") is an elected official,

having served as a Commissioner of Montgomery County, PA since 2015.

2.      Gale was elected as a Commissioner of Montgomery County in November of 2015

and sworn into office in January 2016.

3.      Thereafter, Gale was re-elected in November of 2019 and sworn into office for a

second term in January 2020.

4.      During his time as Commissioner, Gale has maintained a number of social media

accounts, including, but not limited to, a Facebook page, a Twitter account, and an Instagram

account, where he regularly communicates information regarding official government business and

policy to his followers and invites comments.

5.      Gale has frequently used these accounts to express his own views regarding political, governmental, and, most recently, social issues.

6.      However, in a blatant effort to chill speech and suppress what has become regular opposition or dissent to his views, Defendants have excluded or blocked a number of users, including Plaintiffs, from access to his social media accounts, merely because Defendants disagree with the viewpoints these users have expressed.  Defendants have also removed comments and dialogue, expressing viewpoints that he personally finds objectionable, preventing other Montgomery County residents and social media users from full consumption and viewing of that dialogue.

7.      Defendants have not only engaged in impermissible viewpoint discrimination by blocking users from these social media accounts, they have also deprived any individual visiting these pages of their right to read the speech of the dissenters who have been blocked.

8.      These practices are entirely unconstitutional under the First Amendment to the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution.

9.      Plaintiffs, therefore, file this lawsuit to restore their constitutional rights, redress Defendants' blatant violation of them, and order Defendants to restore their access and to ensure that the platform for free speech and recognition that he created remains available to all.

10.     To be clear, there can be no question that Gale has an unfettered, unencumbered right to express his own viewpoints.  This lawsuit does not seek to change that.  It simply demands that Defendants extend the same protection to those individuals who enjoy the same exact rights, and to immediately cease their own actions to abridge them.

**THE PARTIES**

11.     Plaintiff Gabrielle Deardorff is an adult individual who resides in Limerick

Township, Montgomery County, PA.

12.    At all times relevant to the allegations in this Complaint, Plaintiff Deardorff was, and continues to be, a resident of Montgomery County and was, and continues to be, similarly a constituent of Commissioner Gale.

13.    Plaintiff Deardorff operates a Facebook account at facebook.com/abby.a.deardorff, a Twitter account under the handle @gabriellemaryrn, and/or an Instagram account under the handle @gabriellemaryrn.

14.    Plaintiff Bryan Oteri is an adult individual who resides in Lower Gwynedd Township, Montgomery County, PA.

15.    At all times relevant to the allegations in this Complaint, Plaintiff Oteri was, and continues to be, a resident of Montgomery County and was, and continues to be, similarly a constituent of Commissioner Gale.

16.    Plaintiff Oteri maintains a Twitter account under the handle @OT_b1, and an Instagram account under the handle @ohhhhhteeeee.

17.    Plaintiff Caroline & Co Media LLC d/b/a SAVVY Mainline LLC ("SAVVY") is a Pennsylvania registered limited liability company with a principal place of business located in Tredyffrin Township, Chester County, PA.

18.    SAVVY is a monthly online publication that regularly reports on events, activities, news items, and other items of interest in Montgomery County and the Main Line of Philadelphia. A substantial portion of the subscriber base and readership that Plaintiff SAVVY publishes to resides in Montgomery County.

19.    Plaintiff SAVVY maintains a Facebook account at facebook.com/SAVVY-Main-Line-6522991115682367/, a Twitter account under the handle @SAVVYMainLine, and/or an Instagram account under the handle @savvymainline.

20.     Plaintiff Monica D'Antonio is an adult individual who resides in West Norriton Township, Montgomery County, PA.

21.     Plaintiff D'Antonio is Associate Professor of English at Montgomery County Community College and serves as a member of the Norristown Area School Board.  She also serves on the West Norriton Human Relations Commission.

22.     At all times relevant to the allegations in this Complaint, Plaintiff D'Antonio was, and continues to be, a resident of Montgomery County and was, and continues to be, similarly a constituent of Commissioner Gale.

23.     Plaintiff     D'Antonio     maintains     a     Facebook     account     at facebook.com/monica.dantonio.98, a Twitter account under the handle @monica_dantonio, and an Instagram account under the handle @monicadantonio15.

24.     Plaintiff Elaine Hannock is an adult individual residing in Marlborough Township, Montgomery County, Pennsylvania.

25.     At all times relevant to the allegations in this Complaint, Plaintiff Hannock was, and continues to be, a resident of Montgomery County and was, and continues to be, similarly a constituent of Commissioner Gale.

26.     Plaintiff Hannock maintains a Facebook account at facebook.com/Elaine.hannock, and a Twitter account under the handle @jewesss.

27.     Plaintiff Karen Hayman is an adult individual residing in West Norriton Township, Montgomery County, Pennsylvania.

28.     At all times relevant to the allegations in this Complaint, Plaintiff Hayman was, and continues to be, a resident of Montgomery County and was, and continues to be, similarly a constituent of Commissioner Gale.

29.     Plaintiff Hayman maintains a Twitter account under the handle @karenmhayman.

30.     Plaintiff Zak Hutchinson is an adult individual residing in Upper Moreland Township, Montgomery County, PA.

31.     At all times relevant to the allegations in this Complaint, Plaintiff Hutchinson was, and continues to be, a resident of Montgomery County and was, and continues to be, similarly a constituent of Commissioner Gale.

32.     Plaintiff Hutchinson maintains a Facebook account at facebook.com/zhutch87, a Twitter account under the handle @simp_for_marx, and an Instagram account under the handle @koopertrooper87.

33.     Plaintiff Elizabeth C. Brooks is an adult individual residing in Wyndmoor, Springfield Township, Montgomery County, PA.

34.     At all times relevant to the allegations in this Complaint, Plaintiff Brooks was, and continues to be, a resident of Montgomery County and was, and continues to be, similarly a constituent of Commissioner Gale.

35.     Plaintiff Brooks also maintains a place of business in Wyndmoor, Springfield Township, Montgomery County.

36.     Plaintiff Brooks maintains a Facebook account at facebook.com/Elizabeth.Brooks, a Twitter account under the handle @LizBrooksIBCLC, and/or an Instagram account under the handle @ecbrks.

37.     Defendant Joseph C. Gale is an elected Commissioner of Montgomery County, PA, and in his official capacity has a principal place of business at One Montgomery Plaza, Norristown, PA 19401.

38.     Defendant Friends of Joe Gale ("Friends") is an organization that assists Defendant

in the operation and maintenance of his social media accounts and has a principle place of business at 628 Launfall Road, Plymouth Meeting, PA 19462.

39.     At all times relevant to the Complaint, upon information and belief, Defendant Gale and/or Defendant Friends, in their official capacities, maintained the Facebook, Twitter, and Instagram profiles described *infra* paragraphs 78-116 herein.

40.     At all times relevant to the allegations made in this Complaint, Commissioner Gale and Friends acted under color of state law and therefore are subject to liability under 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

41.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201-2202, and 28 U.S.C. § 1367.

42.     Venue is proper in this district court under 28 U.S.C. § 1391(b)(1), as Commissioner Gale is a resident of this judicial district and all Defendants are residents of the state in which the District is located.

43.     In addition, venue is proper in this district court under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this claim occurred in this District.

## FACTUAL ALLEGATIONS

**A.      The Use of Social Media Accounts**

**1.      Twitter**

44.     Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

45.     Twitter is a social media platform with more than 300 million active users worldwide, including more than 100 million who use the service on a daily basis.

46.     The platform allows "users" to publish short updates or messages of no more than

280 characters called "tweets," to "Retweet" or republish tweets uploaded or sent by other users, and to respond to the tweets of other users or the responses of tweets by other users.

47.     Tweets can, and often do, also include photographs, videos, links, or other content in addition to the 280-character limit.

48.     A person or entity becomes a Twitter "user" by creating an account on the platform. Each user selects a "handle," which is the manner in which the username is presented on the platform.  Each Twitter handle begins with an "@" character, normally followed by a series of letters and/or numbers selected by the user.

49.     Any time a user posts a Tweet, they are collected and aggregated together under the user's individual Twitter account known as a "Timeline."  All of a user's tweets are displayed in reverse chronological order, with the most recent tweets appearing at the top of the Timeline.

50.     A user's Twitter page also contains information that identifies the individual or entity that tweets from or operates the account.  The page may also include a biographical or other description of the user, a photograph or photographs of the user, the location from where the user established the account or chooses to be physically located in, and a collection of media, including but not limited to files, photographs, and videos, that the user has Tweeted or posted about.

51.     Any user who is able to view another public user's Twitter page is also able to view the other user's Timeline.

52.     A user may also elect to "Follow" another user.  This places all of the other user's Tweets, and tweets of any other users that the individual user has elected to follow, into a separate collection of tweets by other users called a "Feed."

53.     Twitter also aggregates any replies and retweets into a separate section of the user's profile called "Tweets & replies."  From this section, a user can view any other public user's tweets, replies, and retweets created by the user.

54.     A user may also "like" a tweet sent by another user by clicking on a heart icon depicted directly below an individual tweet.  All tweets that a user has liked are displayed in a separate section of the user's Twitter profile under the heading "Likes."

55.     By default, a Twitter profile is public and available for viewing for anyone on the platform.  However, a user may decide to limit who is able to see and interact with their tweets by "protecting" their Twitter profile or tweets.  Any tweets that are protected are not available for viewing for public users, and instead are viewable only by a select group of users who the user has permitted to view his, her, or its content.

56.     A Twitter user also has the ability to "block" another user from having any access to the user's profile.  A user who is blocked from the tweets of another user is prevented from seeing any tweets, replies, retweets, media, likes, or other content published to the user's Twitter account.  The blocked user is also prevented from even seeing the user's Twitter profile on the platform, and cannot use the platform to otherwise search for the user's tweets.

57.     If a user has been blocked from access to another user's tweets or profile, the user will see a message indicating that he/she/it has been blocked from following the other user's Twitter account and viewing tweets associated with it.

**2.      Facebook**

58.     Facebook is a social media platform that permits individuals or entities to post messages, updates, content, and other media to individual accounts for viewing by others.

59.     Facebook also allows frequent interaction by individual users with other Facebook accounts.

60.     In order to access Facebook, an individual must first create a Facebook "profile," where the person can choose to share information about themselves, their interests, hometown,

work and leisure pursuits, and/or updates.

61.     Following the creation of a Facebook profile, an individual may then create a Facebook "Page," which is often used by businesses, organizations, nonprofits, and, of particular relevance to this case, public figures and elected officials.

62.     Pages are often used by public figures and elected officials to connect with their constituents and to provide information relating to official government business, policymaking, constituent services, or appearances in the area.  These pieces of content or information are known as individual "posts."

63.     The person, or persons, who regularly publish posts to a Facebook page and maintain the same are known as "Administrators."

64.     The default setting for a Facebook page is for it to be publicly available, so that anyone with a Facebook account can have access to it and see the content posted.  However, a Page administrator can choose to limit access to a Facebook page only to those who he or she invites to see the content posted.  If access is limited, information shared on the page can be seen only by those who have been expressly granted access by the Administrator.

65.     In order to interact with a Facebook page, an Administrator may and often does choose to allow other Facebook profiles to "Like" or "Comment" upon one or more posts to the Page.

66.     An administrator may also block an individual Facebook profile's access to an otherwise publicly available page.  The administrator also has the ability to delete any comments from a publicly available page at his/her discretion.

67.     If a Facebook profile owner has been blocked from viewing a Page, the owner will not be able to view the Page from within his/her/its own Facebook account.

### 3.   Instagram

68.     Instagram is a social media platform that allows its users to upload photographs or videos, often taken on users' mobile phones or devices, for other users to view.

69.     In order to access Instagram, an individual or entity must first sign up for an Instagram account.  Like Twitter, an Instagram user must first select a "handle," which also begins with an "@" character, normally followed by a series of letters and/or numbers selected by the user.

70.     A user can post a photograph or video to his, her, or its Instagram profile, and may also append a comment to the photograph or video.  Once uploaded, the photograph or video, and any associated comments posted by the user, become viewable within the Instagram user's profile.

71.     Other Instagram users can then interact with the user who posted the photograph or video by adding his, her, or its own comments to the post.

72.     All photographs and videos posted by an Instagram user are aggregated within the user's Instagram profile.  Like Twitter and Facebook, the default setting within Instagram is that each user's profile is publicly viewable.  Thus, any photographs or videos posted by the user, as well as any comments the user uploads and any comments other users append to the user's posts, are viewable by any other Instagram user.

73.     An Instagram user may decide to limit who is able to see and interact with their tweets by making his, her, or its profile "private."  This prevents other users from viewing the user's photographs, videos, and comments.  Another Instagram user can request to "follow" a private Instagram user, but will only be permitted to see the private user's Instagram content if the private user approves the request and permits the other user to do so.

74.     An Instagram user also has the ability to "block" another user from having any

access to the user's profile.  A user who is blocked is prevented from seeing any photographs, videos, comments, or other content posted to the other user's account.  The blocked user is also prevented from even seeing the user's Instagram profile on the platform, and cannot use the platform to otherwise search for the user's tweets.

75.    If an Instagram user has been blocked from access to another user's profile, the user will see a message indicating that he/she/it has been blocked from following the other user's account and viewing the content associated with it.

**B.    Commissioner Gale's Use of Social Media**

76.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

77.    In 2015, Gale was elected to the Board of Commissioners of Montgomery County, Pennsylvania for a four-year term.  He was sworn into office on January 4, 2016.

78.    In January of 2016, Gale and/or Friends established a Twitter account under the handle @JoeGalePA, which continues to exist today.

79.    Upon establishment of the account, and at all times until on or about June 7, 2020, Gale identified himself in his Twitter profile description as "Montgomery County Commissioner," referring to his elected title.

80.    The profile photo on the account shows Gale speaking from behind a podium bearing the official seal of Montgomery County, and the banner photo shows Gale shaking hands with certain individuals under the text "Joe Gale, Montgomery County Commissioner:" [1]

---

[1] All screenshots presented within paragraphs 78-96 of the Complaint are true and correct copies of tweets and/or content posted to the @JoeGalePA Twitter account, which can be found at https://twitter.com/joegalepa?lang=en.  This Web page was last accessed on June 25, 2020.



81.     The account states that Gale's location is "Norristown, PA," the same municipality where Gale's official government office as a Commissioner of Montgomery County is located.

⌖ Norristown, PA   🔗 JOEGALE.COM   📅 Joined January 2016

**507** Following   **2,199** Followers

82.     Upon information and belief, Gale's home residence is not in Norristown but rather is in Plymouth Meeting, PA.

83.     Almost instantly after being sworn into office, Gale and/or Friends began to use the @JoeGalePA account to communicate with his followers and constituents regarding his official duties as Commissioner of Montgomery County.

84.     Defendants continue to use the @JoeGalePA account to communicate with followers and constituents regarding Gale's official governmental duties and business, to give updates on County policies and procedures, and to share Gale's viewpoints on various political and governmental issues of the day.

85.     For example, on January 14, 2016, Gale and/or Friends tweeted a collage of photographs from Commissioner Gale's meeting with then-Secretary of Labor Thomas Perez, who was visiting Montgomery County:



86.     Upon information and belief, and based upon his presence in the photographs with the other two Commissioners of Montgomery County, Gale would not have been invited to meet Secretary Perez aside from his official capacity as Commissioner.

87.     Throughout his tenure as Commissioner, Gale and/or Friends continued to use @JoeGalePA to post content and updates regarding official Montgomery County government business.

88.     On March 5, 2020, Gale and/or Friends posted a photo of Gale with two other individuals and captioned it: "Excited to help build a foreign exchange student partnership between Germany and Montgomery County Community College."   Upon information and belief, Gale would not have been invited to participate in this program and event had it not been for his position as a Montgomery County Commissioner.



89.     Additionally, on March 10, 2020 Gale and/or Friends posted about a speaking engagement with the Montgomery County Association of Township Officials and advocated for "a strong bond between township and county government."



90.     Upon information and belief, Gale would not have been speaking at this event, nor posting about it, but for his position as a Montgomery County Commissioner.

91.     And, on April 27, 2020, Gale and/or Friends tweeted an announcement that the Small Business Administration was again accepting applications for the Paycheck Protection Program.  Included within the tweet was a video of Gale speaking from behind a Montgomery County Department of Public Safety podium:



92.     Gale and/or Friends also used @JoeGalePA to inform individuals who came to his page about Montgomery County policies and procedures being implemented.  On March 8, 13, and 20, 2020, Gale and/or Friends posted updates and information about COVID-19 in Montgomery County:









93.    Defendants also frequently used @JoeGalePA to express Gale's viewpoints regarding actions being taken by the other Commissioners of Montgomery County and other governmental departments and agencies in Montgomery County and elsewhere.  As the minority Commissioner during his four-year term, Gale frequently expressed his opposition to actions taken by the other two Commissioners on @JoeGalePA.

94.    On May 20 and 21, 2020, Gale and/or Friends tweeted about Gale's disagreement with a different Commissioner of Montgomery County on the issue of social distancing and wearing masks in the face of the COVID-19 pandemic.





95.     Additionally, on April 18, 2020, Gale and/or Friends used @JoeGalePA to express

his dissatisfaction with the COVID-19 emergency orders issued by Pennsylvania Governor

Thomas Wolf:



96.     As a public profile, Defendants' posts at @JoeGalePA were, and continue to be, available to any user Twitter users.  Defendants have not protected this account; anyone who wishes to follow @JoeGalePA can do so, and any user can locate @JoeGalePA on the Twitter platform.

97.     In the midst of his campaign for Commissioner, Gale, who had previously established a Facebook profile under his own name, and/or Friends created a Facebook Page called "Vote Joe Gale," which can be found at https://www.facebook.com/JoeGalePA.

98.     Ostensibly created in an effort to promote his candidacy for Commissioner, after his election in 2015, and inauguration to the position in January 2016, Gale and/or Friends nevertheless immediately began using Vote Joe Gale as his official public page to communicate with followers and constituents regarding Gale's official governmental duties and business, giving updates on County policies and procedures, and sharing Gale's viewpoints on various political and governmental issues of the day.

99.     Gale again identified himself as a "Montgomery County Commissioner" in this Facebook profile after it was created.

100.    The banner photograph for the page was, and remains, a photo of an inauguration ceremony in which Gale was sworn into his official role as Commissioner.  The page's identifying photograph also depicts Gale making remarks from a podium bearing the seal of Montgomery County, with several judges of the Court of Common Pleas of Montgomery County pictured behind him:[2]

---

[2] All screenshots presented within paragraphs 97-107 of this Complaint are true and correct copies of posts and/or content posted to the Vote Joe Gale Facebook page, which can be found at https://www.facebook.com/JoeGalePA.  This Web page was last accessed on June 25, 2020.



101.    The Facebook page is designated as belonging to a "Politician."

102.    Gale and/or Friends similarly used Vote Joe Gale to communicate official governmental information to Gale's constituents and members of the public.  Often, these official pronouncements mirrored those Gale and/or Friends would publish to the @JoeGalePA Twitter account, including a post on March 8, 2020 regarding the COVID-19 pandemic in Montgomery County:



103.    In addition, on May 4, 2020, Gale and/or Friends uploaded a post regarding the availability of Personal Protective Equipment (PPE) in Pennsylvania, above a photo of Gale speaking from behind a Montgomery County Department of Public Safety podium:



104.    And, on May 13, 2020, Gale and/or Friends posted information about in-person polling locations for Montgomery County residents, above a video of a news appearance in which Gale was identified as "Joe Gale, Montgomery County Commissioners:"



105.   Like Twitter, Defendants have also frequently used Vote Joe Gale to publicize Gale's own viewpoints on political, social, and governmental issues in Montgomery County and elsewhere.   On May 2, 2020, Gale and/or Friends posted commentary from Gale in which he criticized former Pennsylvania Governor Tom Ridge and advocated for a change in leadership in Pennsylvania:



106.    From its inception in 2015, Vote Joe Gale was set up as a public Facebook page, accessible to any Facebook user who wished to view it.  The posts Gale and/or Friends have made to Vote Joe Gale were, and continue to be, publicly available for any user to view and comment on who is not otherwise blocked, banned, or restricted from the page.

107.    Gale and/or Friends has never limited access to Vote Joe Gale.  It has always been a publicly available page, and users viewing content posted to the page have the ability to react to his posts and post their own comments regarding the same.

108.    Before the Pennsylvania primary election in 2019, Gale announced that he would be seeking re-election for another four-year term on the Board of Commissioners.  In March of 2019, Gale and/or Friends created the Instagram account @votejoegale, and began posting content to the account documenting his activities and positions.

109.    As he did with his Twitter and Facebook accounts, Gale identified himself (and

continues to identify himself) as a Montgomery County Commissioner in his Instagram profile photograph:[3]



110.    Gale and/or Friends quickly began using this account for more than campaign activities: Gale and/or Friends would soon begin posting photographs, messages, and videos to the @votejoegale account regarding Gale's official government business as an elected official.

111.    Indeed, the @votejoegale Instagram account virtually mirrored the content posted to his @JoeGalePA Twitter account and his Vote Joe Gale Facebook Page.  Gale and/or Friends regularly posted photographs, videos, and content regarding Gale's role as a Montgomery County Commissioner, his activities in that capacity, and his viewpoints on political, social, and economic issues surrounding the County and the United States.

112.    On February 25, 2020, Gale and/or Friends posted a photograph and an associated comment regarding a visit Gale made to A.W. Mercer, a business in Boyertown within Montgomery County:

---

[3] All screenshots presented within paragraphs 108-116 of this Complaint are true and correct copies of posts and/or content posted to the @votejoegale Instagram account, which can be found at https://www.instagram.com/votejoegale/. This Web page was last accessed on June 25, 2020.





113.    Gale and/or Friends similarly used the @votejoegale Instagram page to post regular

content regarding Gale's viewpoints on political, social, and economic issues.  On April 26, 2020,

Gale and/or Friends posted a photograph and associated comment in which Gale criticized

Philadelphia Mayor Jim Kenney:

**The Inquirer**

## Philadelphia Mayor Jim Kenney dined in Chinatown to calm fears of the coronavirus



 votejoegale • Follow        •••

**votejoegale** I truly wonder how many human lives Philadelphia Mayor Jim Kenney jeopardized with this PR stunt two months ago. Shame on Mayor Kenney for not only prioritizing political-correctness ahead of common-sense, but having the nerve to attack President Trump's response to the Chinese virus.

8w

114.    As Defendants began uploading content in the same way that they had on Twitter and Facebook, many Instagram users began interacting with posts from the @votejoegale Instagram account, and many users posted comments regarding the posts.

115.    At no time was the @votejoegale Instagram account made private, nor was access restricted at any time to certain Instagram users by permission.  Rather, the content at all times

was, and continues to be, made publicly available to any Instagram user to view and comment upon.

116.    Gale and/or Friends regularly uploaded content concerning Gale's role as Montgomery County Commissioner to each of the above-referenced social media accounts and provided information to the public at large about his activities.  By so doing, Defendants created public fora for Montgomery County residents and Gale's constituents to participate in, and content for participants to interact about.

**C.    Defendants' Campaign to Restrict Speech on the Official Social Media Accounts**

117.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

118.    At all times from their inception, the aforementioned Twitter, Facebook, and Instagram profiles remained publicly viewable and free for consumption and comment by any users.

119.    However, Gale and/or Friends soon began a targeted campaign to silence constituents within Montgomery County and social media users as a whole who disagreed with Gale's viewpoints.  That campaign was, and continues to be, a direct and complete violation of the First Amendment rights of these users, and of those who wish to see the complete marketplace of ideas surrounding the content posted to Defendants' social media accounts.

120.    Upon information and belief, Gale and/or Friends began to block users from viewing the tweets at @JoeGalePA no later than the year 2017, just one year after being sworn into his elected position as a Montgomery County Commissioner.  Upon further information and belief, Gale and/or Friends began blocking individuals from viewing content associated with his Facebook profile in the same timeframe.

121.    The vast majority of social media users blocked by Gale and/or Friends were those

who posted comments or content expressing disagreement, disappointment, or opposition to viewpoints that Gale expressed. Gale and/or Friends continued to permit interaction on his Twitter and Facebook profiles with those users that expressed support, agreement, or admiration for his viewpoints or work as a Commissioner.

122.    Not only did Gale and/or Friends individually target and block users who disagreed with them, but they also ensured that many negative comments or content posted to his Twitter or Facebook accounts were deleted, excised, or disposed of so that others could not see them. Gale and/or Friends selectively deleted a number of these comments so that users who would otherwise be able to view all content on his accounts were no longer able to see the comments expressing disagreement or opposition, and otherwise would not have been aware that such opposing viewpoints had been expressed.

123.    Gale and/or Friends continued this campaign of suppression after beginning his Instagram account in 2019. They systematically blocked disfavored Instagram users from accessing the @votejoegale account, and regularly deleted comments from the account that Gale and/or Friends found unfavorable.

**D.      The June 1, 2020 Statement**

124.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

125.    Gale and/or Friends continued to post regular content regarding Gale's official activities as Montgomery County Commissioner from each of the aforementioned social media accounts throughout his first term as Commissioner, as well as after Gale's re-election in 2019 and swearing in for another term in January 2020.

126.    On June 1, 2020, Gale and/or Friends posted the following statement on his @JoeGalePA Twitter account, Vote Joe Gale Facebook page, and @votejoegale Instagram

account:[4]



JOSEPH C. GALE
COMMISSIONER
BOARD OF COMMISSIONERS
MONTGOMERY COUNTY, PENNSYLVANIA

June 1, 2020

**PRESS STATEMENT:  RIOTS & LOOTING IN PHILADELPHIA**

What we saw this weekend in Philadelphia was not a protest - it was a riot.  In fact, nearly every major city across the nation was ravaged by looting, violence and arson.

The perpetrators of this urban domestic terror are radical left-wing hate groups like Black Lives Matter. This organization, in particular, screams racism not to expose bigotry and injustice, but to justify the lawless destruction of our cities and surrounding communities. Their objective is to unleash chaos and mayhem without consequence by falsely claiming they, in fact, are the victims.

For years, our police men and women have been demonized and degraded by the radical left.  As a result of this defamation and character assassination, as well as a complicit media constantly pushing the bogus narrative of systemic police brutality and white racism, law enforcement is afraid to do their job of protecting innocent people and their property.

In addition, too many Democrat mayors are sympathizers of these far-left radical enemy combatants. As a result, their misguided empathy has enabled a level of unfettered criminality never witnessed before in American history.

Sadly, Philadelphia Mayor Jim Kenney falls in this category of sympathetic Democrat mayors. And his handpicked Philadelphia Police Commissioner Danielle Outlaw seems to share her boss's sentiment. Frankly, the name Outlaw fits her to a tee.

This past weekend, I watched television coverage of police officers being ordered to stand down as the statue of Frank Rizzo was spray painted, lit on fire and attempted to be pulled down.

The only way to stop this vandalism and chaos is by allowing law enforcement to do their job of enforcing the law. Otherwise, so-called 'peaceful protests' end up escalating to into violence, arson and looting.

Police cannot continue to 'give space' to opportunists and lawbreakers. Because as they say, 'If you give an inch, they will take a foot.'

We need law-and-order. We need leaders who will uphold the laws they swore to defend when they placed their hand on the Holy Bible on inauguration day.  The broken promises of failed Democrat mayors like Jim Kenney have led not just to broken windows, but a broken public trust that must be restored before more cities are shattered.

###

P.O. BOX 311 NORRISTOWN, PA 19404 - 0311
JOE@MONTCOPA.ORG

127.    Gale gave the statement the utmost appearance of an official proclamation in his capacity as a Montgomery County Commissioner.   He issued the statement on letterhead purportedly bearing the seal of Montgomery County, and under his official title as Montgomery County Commissioner.  *Id.*  The bottom of the statement also provided his official governmental address (P.O. Box 311, Norriston, PA 19401-0311), and his official governmental e-mail address (joe@MontcoPa.org).  *Id.*

---

[4] A true and correct copy of the statement is separately appended to this Complaint as **Exhibit "A."**  It is hereinafter often referred to in this Complaint as the "June 1 Statement."

128.    The June 1 Statement drew immediate condemnation not only from multiple users across social media, but also from multiple public officials, groups, and other elected officials. The supervisory boards of a number of governmental municipalities issued statements condemning Gale's statement and calling for him to resign.  Other groups and individuals, including, but not limited to, the Police Chiefs Association of Montgomery County, the Lower Merion School Board, and the mayors of nine separate municipalities within Montgomery County, similarly condemned the statement and disassociated themselves from his comments.

129.    The other two members of Montgomery County's Board of Commissioners voted to censure Gale at the Board of Commissioners' regular meeting on June 4, 2020, a meeting that also drew a number of public comments condemning the June 1 statement.

130.    The statement also attracted considerable media coverage in the greater Philadelphia community, and did not go unnoticed by state lawmakers in Harrisburg.  One lawmaker, Representative Joseph Webster of Montgomery County, announced plans to introduce a resolution calling for Gale's immediate impeachment, and then introduced the same into the Pennsylvania legislature on June 23, 2020.[5]

131.    The June 1 Statement also attracted widespread opposition on social media. Multiple users posted comments and content expressing their disagreement or disgust with the statement, and many others called for Gale's immediate resignation.

132.    Despite the widespread opposition to the content of his statement, Gale enjoys, and should enjoy, the right under the First Amendment to the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution to express his own viewpoints.  **Plaintiffs herein do not seek to disturb that right**.  **As described *infra*, they instead request that Defendants**

---

[5] *See* Pennsylvania H.R. 920, Session of 2020, a true and correct copy of which is attached as Exhibit "B" and is accessible at:
https://www.legis.state.pa.us/CFDOCS/Legis/PN/Public/btCheck.cfm?txtType=PDF&sessYr=2019&sessInd=0&billBody=H&billTyp=R&billNbr=0920&pn=4004 (last visited June 25, 2020).

**immediately cease infringing upon their identical rights.**

> **E.      Gale and/or Friends Block the Individual Plaintiffs from Their Social Media Accounts**
>
> **1.      Plaintiff Deardorff**

133.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

134.    As a member of the public, and as one of Gale's constituents, Plaintiff Deardorff had and continues to have a vested interest in and regularly followed Gale's activities across the aforementioned social media accounts.

135.    Following Gale's publication of his June 1 statement, Plaintiff Deardorff viewed the statement on the Vote Joe Gale Facebook page, @JoeGalePa Twitter feed, and on the @votejoegale Instagram profile maintained by Defendants.

136.    In response to the post, on Tuesday, June 2, Plaintiff Deardorff responded to the statement by posting a comment to the post of the statement on the @votejoegale Instagram page that stated "Resign."

137.    Later, on June 2, 2020, Gale and/or Friends uploaded another post to Instagram in which Gale alleged that another Commissioner of Montgomery County had displayed hypocrisy by not observing social distancing requirements.

138.    In response to that post, Plaintiff Deardorff posted a comment that called the other Commissioner a "real leader" and again urged Gale to resign.

139.    On June 4, 2020, Gale and/or Friends posted a statement by Gale to Twitter which read:



140.    In response to that post, Plaintiff Deardorff posted a reply to the tweet that stated,
"If you were really pro life [sic] and not just pro white fetus, you wouldn't be such a racist."

141.    True and correct copies of the above-cited posts by Deardorff  are attached as
**Exhibit "C."**

142.    By June 4, 2020, Plaintiff Deardorff discovered that she had been blocked from all
three of the social media accounts maintained by Defendants.

143.    Defendants' blocking of Plaintiff Deardorff from Gale's official Twitter, Facebook,
Instagram profile prevents Plaintiff Deardorff not only from viewing Gale's own uploaded content,
but also from viewing the comments and replies of other users and from participating in the feeds
associated with this content.

### 2.      Plaintiff Oteri

144.    Plaintiffs repeat the allegations previously set forth in this Complaint and
incorporate them as though fully stated herein.

145.    As a member of the public, and as one of Gale's constituents, Plaintiff Oteri had,
and continues to have, a vested interest in and regularly followed Gale's activities across the
aforementioned social media accounts.  Specifically, he followed the @JoeGalePA Twitter page

and the @votejoegale Instagram page through his own social media accounts.

146.    Following Gale's publication of his June 1 statement, Plaintiff Oteri viewed the statement on the @votejoegale Instagram profile maintained by Defendants.

147.    In response to the post, on Tuesday, June 2, Plaintiff Oteri responded to the statement by posting a comment to the post of the statement on the @votejoegale Instagram page that stated "Yet you choose to silence constituents by blocking them on social media or censoring their comments on your posts?  #peoplebeforepolitics."  A true and correct copy of the comment sent by Plaintiff Oteri is attached as **Exhibit "D."**

148.    By June 4, 2020, Plaintiff Oteri discovered that he had been blocked from Gale's official Instagram profile maintained by Defendants.

149.    Defendants' blocking of Plaintiff Oteri from Gale's official Instagram profile prevents Plaintiff Oteri not only from viewing Gale's own uploaded content, but also from viewing the comments and replies of other users and from participating in the feeds associated with this content.

**3.    Plaintiff SAVVY**

150.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

151.    Plaintiff SAVVY is a wide-ranging periodical and publication that reports on events and activities within Montgomery County that counts hundreds of Montgomery County residents among its readership.  As such, Plaintiff SAVVY has and continues to have a vested interest in and regularly followed Gale's activities across his social media accounts.

152.    At all times relevant to the allegations in this Complaint, Caroline & Co Media LLC d/b/a SAVVY Main Line has been owned and operated by Caroline O'Halloran, who also controls Plaintiff's SAVVY's social media accounts.

153.    Following Gale's first election to the Board of Commissioners in 2015, O'Halloran interviewed Gale for the possibility of an article for Plaintiff SAVVY regarding his election and official duties.  Although Gale inquired of O'Halloran several times as to when he could expect to read the published article, O'Halloran chose not to publish it in SAVVY.

154.    Even after writing a separate article in May 2020 that reported on Gale's opposition to testing for COVID-19 exposure, Plaintiff SAVVY remained able to view Gale's official social media accounts without restriction.

155.    Following the publication of Gale's June 1 statement on his official @JoeGalePA Twitter feed, on June 2, 2020, Plaintiff SAVVY, through its own Twitter account, responded to the tweet by stating, "Please do your homework about the Black Lives Matter movement before drafting such statements.  You are woefully misinformed."   A true and correct copy of the comment sent by Plaintiff SAVVY is attached as Exhibit "E."

156.    After posting the response, Plaintiff SAVVY again attempted to view the @JoeGalePA Twitter account.  It was only after returning to the page that Plaintiff SAVVY saw that Defendants had blocked it from access the account.

157.    Defendants' blocking of Plaintiff SAVVY from Gale's official Facebook and Twitter accounts prevents Plaintiff SAVVY not only from viewing Gale's own uploaded content, but also from viewing the comments and replies of other users and from participating in the feeds associated with this content.

**4.    Monica D'Antonio**

158.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

159.    As a member of the public, and as one of Gale's constituents, Plaintiff D'Antonio had and continues to have a vested interest in and regularly followed Gale's activities across his

social media accounts.   Plaintiff D'Antonio's interest in Gale's official activities and pronouncements from his social media accounts is even further enhanced by her status as an elected official in Norristown Borough.

160.    On May 19, 2020, Gale and/or Friends posted a photo to the @JoeGalePA account depicting a meeting of the Board of Commissioners along with a comment from Gale in which he criticized another Commissioner as being "two faced" and "only practicing social distancing and mask wearing when on camera for press conferences."  The photo was undated.



161.    Through her own Twitter account, Plaintiff D'Antonio commented on this post saying, "Because it's coming from you, I'd like to see a date on that pic."



162.    Plaintiff D'Antonio also viewed the June 1 Statement on Gale's official Facebook and Instagram pages.

163.    After viewing the June 1 Statement, Plaintiff D'Antonio posted a comment to the Facebook post publishing the statement expressing her disagreement with the same.   Plaintiff D'Antonio posted a similar comment under the Instagram post where Defendants had published the June 1 Statement.

164.    Following her posts to Defendants' Facebook and Instagram accounts, Plaintiff D'Antonio attempted to view those accounts to see further discourse related to them.  It was only after returning to the Facebook and Instagram accounts that Plaintiff D'Antonio realized that Defendants had blocked her from access to the accounts.

165.    Defendants' blocking of Plaintiff D'Antonio from Gale's official Facebook and Instagram accounts prevents Plaintiff D'Antonio not only from viewing Gale's own uploaded content, but also from viewing the comments and replies of other users and from participating in the feeds associated with this content.

### 5.    Elaine Hannock

166.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

167.    As a member of the public, and as one of Gale's constituents, Plaintiff Hannock had and continues to have a vested interest in and regularly followed Gale's activities across his Twitter and Facebook accounts.

168.    Following the publication of Gale's June 1 Statement, Plaintiff Hannock posted a comment on June 3, 2020 directly under his publication on Facebook in which she expressed her opposition to the Statement.  That comment is no longer viewable, as, upon information and belief,

Defendants selectively deleted it.

169.    Also on June 3, 2020, Plaintiff Hannock replied to Defendants' publication of the June 1 Statement on Twitter with the identical language that she used to comment on Facebook. This reply also is no longer viewable, as, upon information and belief, Defendants selectively deleted it.

170.    After posting her response to the tweet publishing the June 1 statement, Plaintiff Hannock again attempted to view the Vote Joe Gale Facebook page and @JoeGalePA Twitter account.  It was only after returning to the page that Plaintiff O'Halloran saw that Defendants had blocked her from the account.

171.    Defendants' blocking of Plaintiff Hannock from Gale's official Facebook and Twitter accounts prevents Plaintiff Hannock not only from viewing Gale's own uploaded content, but also from viewing the comments and replies of other users and from participating in the feeds associated with this content.

**6.     Karen Hayman**

172.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

173.    As a member of the public, and as one of Gale's constituents, Plaintiff Hayman had and continues to have a vested interest in and regularly followed Gale's activities across his social media accounts.

174.    On or after June 1, 2020, Plaintiff Hayman viewed the publication of Gale's June 1 Statement on the @JoeGalePA Twitter account.

175.    On June 5, 2020, Plaintiff Hayman posted a reply to the tweet used by Defendants to publicize the June 1 Statement by expressing her disapproval of the Statement and her simultaneous approval of the actions of Gale's fellow Commissioners to censure him for making

the June 1 Statement.

176.     After posting her response to Gale's tweet publishing the June 1 statement, Plaintiff Hayman again attempted to view the @JoeGalePA Twitter account.  It was only after returning to the page that Plaintiff Hayman saw that Defendants had blocked her from the account.

177.     Defendants' blocking of Plaintiff Hayman from Gale's official Facebook and Twitter accounts prevents Plaintiff Hayman not only from viewing Gale's own uploaded content, but also from viewing the comments and replies of other users and from participating in the feeds associated with this content.

### 7.     Zak Hutchinson

178.     Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

179.     As a member of the public, and as one of Gale's constituents, Plaintiff Hutchinson had and continues to have a vested interest in and regularly followed Gale's activities across his social media accounts.

180.     Plaintiff Hutchinson had "followed" Gale's Twitter and Instagram accounts through his own profiles, and regularly checked the Vote Joe Gale Facebook page for updated content posted by Defendants, on or before June 1, 2020.

181.     One or shortly after June 1, 2020, Plaintiff Hutchinson viewed the June 1 Statement on the @JoeGalePA Twitter account.

182.     On June 3, 2020, Plaintiff Hutchinson posted a reply to the tweet publishing the June 1 Statement, in which he expressed his staunch opposition to the Statement and the message that it espoused.

183.     After posting his response to the tweet publishing the June 1 statement, Plaintiff Hutchinson again attempted to view the @JoeGalePA Twitter account.  It was only after returning

to the page that Plaintiff Hutchinson saw that Defendants had blocked him from the account.

184.    Plaintiff Hutchinson then attempted to view the @votejoegale Instagram account, only to learn at that time that Defendants had also blocked him from that account.

185.    Defendants' blocking of Plaintiff Hutchinson from Gale's official Facebook and Twitter accounts prevents Plaintiff Hutchinson not only from viewing Gale's own uploaded content, but also from viewing the comments and replies of other users and from participating in the feeds associated with this content.

**8.      Elizabeth Brooks**

186.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

187.    As a member of the public, and as one of Gale's constituents, Plaintiff Brooks had and continues to have a vested interest in and regularly followed Gale's activities across his social media accounts.

188.    Plaintiff Brooks viewed Gale's June 1 Statement and immediately desired to see the full complement of discourse and viewpoints among members of the public that flowed from it.

189.    Unlike the other Plaintiffs, Plaintiff Brooks has not, as of the filing of this Complaint, been blocked from viewing the aforementioned Twitter, Facebook, or Instagram accounts.  Plaintiff Brooks can view Gale's content uploaded to these platforms and can participate fully in discussion regarding the same.

190.    However, Plaintiff Brooks was, has been, and/or continues to be prevented from hearing speech of others opposing Gale's viewpoints, and any dialogue stemming from that speech, because Defendants have selectively deleted or removed comments or content posted by other users that they deem objectionable.

191.    As such, Plaintiff Brooks' First Amendment rights have been infringed by Gale

and/or Friends' distorting of the expressive forum in which Plaintiff Brooks as well as any other social media users that have not been blocked may participate in.

### F.      Defendants' Continued Suppression

192.     Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

193.     Defendants have shown no signs of relaxing their continued campaign of infringing upon the First Amendment rights of any social media users who disagree with Gale's viewpoints. Indeed, upon information and belief, they continues to restrict dozens, if not more, of social media users opposing his viewpoints from participation in the public fora that they created.  Similarly, Gale and/or Friends continue to distort and control the discourse emanating from Gale's public pronouncements as a Montgomery County Commissioner.

194.     Indeed, Gale has dedicated himself to ensuring that this widespread infringement will continue.  In a post shared publicly across all three of his social media profiles on June 7, 2020, Gale stated emphatically that "[a]gitators, anarchists and agent provocateurs will not be allowed to spew their lies and hate on my personal and campaign social-media platforms:"

195.     Defendants thus have re-dedicated themselves to violating the free speech rights of those who oppose them.  Gale's public statements confirm that those who might oppose him, or those who he singularly views as objectionable, will be entirely excluded from the public platforms that he and/or Friends created.  Gale has left little question that he will continue his campaign of several years to suppress speech that he finds unfavorable.

196.     Moreover, Gale and/or Friends continue to post Gale's viewpoints and activities as a Montgomery County Commissioner across all of his social media accounts, reaffirming his use of them under the color of his elected position.

197.    In a further attempt to curtail speech that he finds unfavorable, after publication of the June 1 Statement, Defendants sought to re-classify Gale's publicly available and official social media pages as his "private" social media accounts.

198.    At no point, however, has Gale ceased referring to himself as a Commissioner of Montgomery County, and at no time have Defendants ceased uploading content that pertains exclusively to his activities in his official capacity as a commissioner.

199.    Indeed, as recently as June 22, 2020, Gale and/or Friends posted to the Vote Joe Gale Facebook account a statement regarding Gale's recent inclusion in an article written in Newsweek Magazine, and quoted from the article that described Gale in his official title and set forth the viewpoints he expressed in the June 1 Statement:



200.    The attempted re-classification of the aforementioned social media platforms into "private" accounts is a thinly veiled attempt to legitimize Gale and/or Friends' own unconstitutional actions.  Defendants should not be able to escape the public fora that they created for free public speech and consumption merely by re-naming them.

**CAUSES OF ACTION**

**COUNT I – PLAINTIFFS v. DEFENDANTS**

**Violation of the First Amendment of United States Constitution under 42 U.S.C. § 1983**
**(Injunctive Relief)**

201.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

202.    The right of Plaintiffs to the free exercise of speech and/or to freedom of expression is protected under the First Amendment to the United States Constitution, which is applied to Plaintiffs under the Fourteenth Amendment to the United States Constitution.

203.    The establishment and/or maintenance of the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and/or the Instagram account @votejoegale constituted public fora under the United States Constitution.

204.    In blocking Plaintiffs Deardorff, Oteri, SAVVY, D'Antonio, Hannock, Hayman, and Hutchinson from access to the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and the Instagram account @votejoegale, and in restricting the access of Plaintiff Brooks to a complete picture of the fora by deleting and/or removing content and comments that Defendants view as inappropriate and/or objectionable, and at all times relevant to the facts and allegations set forth in this Complaint, Defendants act and continue to act under color of state law.

205.    Defendants' actions to block Plaintiffs Deardorff, Oteri, SAVVY, D'Antonio, Hannock, Hayman, and Hutchinson from access to the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and the Instagram account @votejoegale, and to restrict the access of Plaintiff Brooks to the marketplace of ideas in the fora by deleting and/or removing content and comments that Defendants view as inappropriate violates the First Amendment Rights of Plaintiffs because those actions:

   a.  impose a viewpoint-based restriction on the Plaintiffs' participation in one or more public fora;

   b.  impose a viewpoint-based restriction on the Plaintiffs' access to statements made by

Gale in his official capacity as a Commissioner of Montgomery County;

c. impose a viewpoint-based restriction on the Plaintiffs' ability to petition the government for redress of grievances;

d. impose a viewpoint-based restriction on Plaintiff Brooks' right to hear; and

e. were neither content-neutral, nor narrowly tailored to serve important governmental interests, and failed to permit ample alternative channels for communication of Plaintiffs' messages.

206.    Plaintiffs are likely to succeed on the merits of their claims, such that injunctive relief in their favor is warranted.

207.    Plaintiffs will suffer irreparable and immediate harm if injunctive relief is not granted, and have no clear and present remedy for Defendants' violation of their Constitutional rights, which will continue unfettered until enjoined by an appropriate Order of this Court.

208.    Defendants will not suffer irreparable harm if the injunctive relief requested is granted.

209.    The public interest strongly favors injunctive relief in this case.

## COUNT II – PLAINTIFFS v. DEFENDANTS
## Violation of Article I, Section 7 of the Pennsylvania Constitution

210.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

211.    The right of Plaintiffs to the free exercise of speech and/or to freedom of expression is protected under Article I, Section 7 of the Pennsylvania Constitution.

212.    The establishment and/or maintenance of the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and/or the Instagram account @votejoegale constituted public fora under the Pennsylvania Constitution.

213.    In blocking Plaintiffs Deardorff, Oteri, SAVVY, D'Antonio, Hannock, Hayman, and Hutchinson from access to the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and the Instagram account @votejoegale, and to restrict the access of Plaintiff Brooks to a complete picture of the fora by deleting and/or removing content and comments that Defendants view as inappropriate and/or objectionable, and at all times relevant to the facts and allegations set forth in this Complaint, Defendants act and continue to act under color of state law.

214.    Defendants' actions to block Plaintiffs Deardorff, Oteri, SAVVY, D'Antonio, Hannock, Hayman, and Hutchinson from access to the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and the Instagram account @votejoegale, and in restricting the access of Plaintiff Brooks to a complete picture of the fora by deleting and/or removing content and comments that Defendants view as inappropriate or objectionable violates the rights enjoyed by Plaintiffs under the Pennsylvania Constitution because their actions:

      a.  impose a viewpoint-based restriction on the Plaintiffs' participation in one or more public fora;

      b.  impose a viewpoint-based restriction on the Plaintiffs' access to statements made by Gale in his official capacity as a Commissioner of Montgomery County;

      c.  impose a viewpoint-based restriction on the Plaintiffs' ability to petition the government for redress of grievances;

      d.  impose a viewpoint-based restriction on Plaintiff Brooks' right to hear; and

      e.  were neither content-neutral, nor narrowly tailored to serve important governmental interests, and failed to permit ample alternative channels for communication of Plaintiffs' messages.

215.    Plaintiffs are likely to succeed on the merits of their claims, such that injunctive relief in their favor is warranted.

216.     Plaintiffs will suffer irreparable and immediate harm if injunctive relief is not granted, and have no clear and present remedy for Defendants' violation of their rights under the Pennsylvania Constitution, which will continue unfettered until enjoined by an appropriate Order of this Court.

217.     Defendants will not suffer irreparable harm if the injunctive relief requested is granted.

218.     The public interest strongly favors injunctive relief.

**COUNT III – PLAINTIFFS v. DEFENDANTS**
**Violation of the First Amendment of United States Constitution under 42 U.S.C. § 1983**
**and/or Article 1 Section 7 of the Pennsylvania Constitution**
**(Declaratory Relief)**

219.     Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

220.     An actual, immediate, justiciable, and present controversy exists between Plaintiffs on the one hand, and on Defendants on the other, concerning Plaintiffs' rights to participate in public debate by posting, responding, accessing, and commenting upon Gale's activities and posts on his official social media accounts.

221.     The controversy is ripe for determination and/or judicial decision, and declaratory relief is both necessary and appropriate so that the parties may know the legal obligations that govern their conduct.

**WHEREFORE**, Plaintiffs respectfully pray for judgment in their favor and against Defendants, and that the Court:

(a)      Grant injunctive relief to Plaintiffs requiring Defendants to unblock Plaintiffs Deardorff, Oteri, SAVVY, D'Antonio, Hannock, Hayman, and Hutchinson from, and/or restore access to, each of Defendant's social media accounts;

(b)      Grant injunctive relief to Plaintiffs requiring Defendants to immediately cease

deleting, excising, or disposing of comments or content uploaded to the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and the Instagram account @votejoegale;

(c)     Enter an order declaring that Defendants' actions to block Plaintiffs from access to the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and the Instagram account @votejoegale, and in restricting the access of Plaintiffs to a complete picture of the fora by deleting and/or removing content and comments that Gale singularly views as inappropriate violates the First Amendment to the United States Constitution and/or Article I, § 7 of the Pennsylvania Constitution;

(d)     Award Plaintiffs their costs and reasonable attorneys' fees under 42 U.S.C. § 1988;

(e)     Award Plaintiffs nominal, compensatory, and punitive damages in an amount exceeding the jurisdictional limits of this Court; and

(f)     Award Plaintiffs such other relief as it may deem necessary and proper.

**WALSH PANCIO, LLC**                                    **PHILIP PRESS LAW OFFICE**

BY: _____              BY: __/s/ Philip Press___ _____
    Joseph P. Walsh, Esquire                       Philip Press, Esquire
    Michael J. Lyon, Esquire                       I.D. No. 306374
    I.D. No. 64352/306519                          30 West Airy Street
    2028 North Broad Street                        Norristown, PA 19401
    Lansdale, PA  19446-1004


**MUDRICK & ZUCKER, P.C.**

BY: _____
    Adam Zucker, Esquire
    Samantha Harris, Esquire
    I.D. No.
    325 Sentry Parkway
    Building 5 West, Suite 320
    Blue Bell, PA 19422