**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GABRIELLE DEARDORFF, BRYAN | : | |
| OTERI, CAROLINE & CO MEDIA LLC, | : | |
| d/b/a SAVVY MAIN LINE, | : | |
| MONICA D'ANTONIO, ELAINE | : | |
| HANNOCK, KAREN HAYMAN, | : | |
| ZAK HUTCHINSON, and ELIZABETH C. | : | |
| BROOKS, | : | NO. |
| | : | |
| *Plaintiffs* | : | |
| v. | : | |
| | : | |
| JOSEPH C. GALE, Individually and in | : | |
| His Official Capacity as Commissioner of | : | |
| Montgomery County, PA; and FRIENDS | : | |
| OF JOE GALE, | : | |
| *Defendants* | : | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

**I.     INTRODUCTION**

Through his Facebook, Twitter, and Instagram Pages, Montgomery County
Commissioner Defendant Joseph C. Gale, individually and in his official capacity as
Commissioner of Montgomery County, PA ("Commissioner Gale" or "Gale") and Defendant
Friends of Joe Gale (together, "Defendants") have established public fora for the expression of
views and opinions about Gale's policies and his performance as an elected official.
Commissioner Gale uses the Pages to publicize County initiatives, enlist constituent support for
his policies, and criticize his opponents. The interactive portions of the Pages permit users to
comment on Commissioner Gale's posts, to comment on other users' comments, and for
Commissioner Gale to respond.

On June 1, 2020, Commissioner Gale – via his social media Pages – issued a Press
Statement, on County letterhead, condemning "riots and looting" in Philadelphia and decrying

the Black Lives Matter organization as a "radical left-wing hate group[]." The statement also referred to police brutality and white racism as "bogus narrative[s]," and suggested that the Black Lives Matter movement justifies the lawless destruction of…cities and surrounding communities."

This statement drew widespread public condemnation, including on Commissioner Gale's social media Pages where it was primarily disseminated. Rather than address public criticism and disapproval of the statement, Defendants instead blocked a number of constituents and members of the public, including several of the Plaintiffs in this lawsuit, from commenting on or accessing his social media Pages.  Defendants also selectively deleted a number of uploaded comments and content that Commissioner Gale found unfavorable.  The effect of these unconstitutional actions was to prevent complete access to the marketplace of ideas surrounding Commissioner Gale's controversial public statements.

To address these blatant violations of their constitutional rights, Plaintiffs now seek declaratory and injunctive relief, as well as damages, arising out of this violation of their First Amendment rights.  They now seek a temporary restraining order (TRO) and preliminary injunction to ensure that their rights are protected and the unconstitutional conduct does not continue.

This Court should grant Plaintiffs' Motion.  Plaintiffs are likely to prevail on the merits of their claim, as Defendants squarely violated their constitutionally protected rights to free speech and free discourse of ideas under color of state law.  Defendants' conduct has caused Plaintiffs to suffer irreparable harm, and both the balance of the harms and the public interest strongly favors the injunctive relief Plaintiffs seek.  For these reasons, and those that follow, Plaintiffs' motion should be granted.

II.     **FACTUAL BACKGROUND**

A. **Defendants' Social Media Pages**

   i.     ***Commissioner Gale's Twitter Page***

Commissioner Gale and/or Friends of Joe Gale maintain a Twitter account under the handle @JoeGalePA. The account has more than 2,200 Twitter followers and features a profile photo of Commissioner Gale speaking from behind a podium bearing the official seal of Montgomery County, and a banner photo of Commissioner Gale shaking hands with constituents under the text "Joe Gale, Montgomery County Commissioner." *See* Complaint at ¶ 80 and screenshot therein. The Page's location is identified as "Norristown, PA," which is the county seat of Montgomery County and the location of the County Commissioners' office. *Id.* at ¶ 81 and screenshot therein. The selection of Norristown as the Twitter account's location is particularly notable given that, upon information and belief, Commissioner Gale does not reside in Norristown but rather in Plymouth Meeting, PA.

The Twitter account features frequent tweets by Defendants discussing Commissioner Gale's activities as Commissioner and disseminating information to constituents. On March 5, 2020, Defendants posted a photo of Gale with two other individuals and captioned it: "Excited to help build a foreign exchange student partnership between Germany and Montgomery County Community College." Additionally, on March 10, 2020, Defendants posted about a speaking engagement with the Montgomery County Association of Township Officials and advocated for "a strong bond between township and county government." Upon information and belief, Gale would not have been invited to participate in either program but for his position as a Montgomery County Commissioner. On April 27, 2020, Defendants tweeted an announcement that the Small Business Administration was again accepting applications for the Paycheck

Protection Program, and included a video of Commissioner Gale speaking from behind a Montgomery County Department of Public Safety podium. *See* Complaint at ¶ 91.

Defendants also frequently used @JoeGalePA to express Gale's viewpoints regarding actions being taken by the other Commissioners of Montgomery County and other governmental departments and agencies in Montgomery County and elsewhere. As the minority Commissioner during his four-year term, Gale frequently expressed his opposition to actions taken by the other two Commissioners or other governmental actors on @JoeGalePA. On May 20 and 21, 2020, Gale posted about his disagreement with a different Commissioner of Montgomery County on the issue of social distancing and wearing masks in the face of the COVID-19 pandemic. *See* Complaint at ¶ 94, and screenshot therein. And, on April 18, 2020, Gale used @JoeGalePA to express his dissatisfaction with the COVID-19 emergency orders issued by Pennsylvania Governor Thomas Wolf. *Id.* at ¶ 95.

As of this filing, the Page remains active.

### ii. *Commissioner Gale's Facebook Page*

Defendants also maintain the "Vote Joe Gale" Facebook page under the username @JoeGalePA. The page has nearly 8,000 followers. Unlike personal Facebook "profiles," which are for non-commercial use and used by individuals, Facebook "Pages" are "places on Facebook where artists, public figures, businesses, brands, organizations and nonprofits can connect with their fans or customers."[1] The Vote Joe Gale Page bears a "Politician" designation and is separate from a personal Facebook profile[2] that Gale also maintains. *See* Complaint at ¶ 97-101.

---

[1] *See* "What's the difference between a profile, Page and group?" at https://www.facebook.com/help/337881706729661?helpref=faq_content.

[2] Gale also maintains a personal Facebook page under his own name, which is not at issue in this case.

The Page features a profile photo of Commissioner Gale speaking from behind a podium bearing the official seal of Montgomery County and a banner photo of Commissioner Gale being sworn into office by several judges in front of a podium bearing the official seal of Montgomery County. *Id.* at ¶ 100.

The middle of the Page is organized in reverse chronological order and consists of "posts" by Commissioner Gale and comments by Facebook users on those posts.[3] Like other Facebook Pages, the Vote Joe Gale Facebook Page is interactive. Users can respond to or comment on each post, express approval of a particular post by clicking on the "Like" option, or "Share" the post, thereby publishing the post on the user's own profile or Page. A Facebook user who is "banned" can view the Vote Joe Gale Facebook Page but cannot interact with it in any way, including through commenting or participating in the discussions.[4]

The Vote Joe Gale Facebook Page features frequent posts by Commissioner Gale discussing his activities as Commissioner and disseminating information to constituents. On May 4, 2020, Defendants posted an update on the availability of Personal Protective Equipment (PPE) in Pennsylvania, above a photo of himself speaking from behind a Montgomery County Department of Public Safety podium. *Id.* at ¶ 103.   On May 13, 2020, Defendants posted information about in-person polling locations for Montgomery County residents, above a screenshot of a news appearance in which he was identified as "Joe Gale, Montgomery County Commissioners." *Id.* at ¶ 104.   The page also contains frequent posts regarding Commissioner Gale's political, social, and governmental opinions and viewpoints.  *Id.* at ¶ 105.

---

[3] A "post" is the content that a Facebook user with friends, followers or, as in the case of the Vote Joe Gale Facebook Page, the public.  Posts can be made by the owner of a Facebook profile or Page, or by other users who visit a profile or Page.

[4] *See* "How do I ban or unban someone from my Page?" at https://m.facebook.com/help/185897171460026?helpref=faq_content.

As of this filing, the Page remains active.

### iii.    Commissioner Gale's Instagram Page

In addition to his Facebook page and Twitter account, Commissioner Gale maintains an Instagram account under the username "@votejoegale." The account has approximately 400 followers. The Page features a profile photo of Commissioner Gale speaking from behind a podium bearing the official seal of Montgomery County, and consists of a series of posts from Commissioner Gale discussing his activities as a Commissioner and disseminating information to constituents. *Id.* at ¶ 109.   On February 25, 2020, Defendants posted a photograph and an associated comment regarding a visit Gale made to A.W. Mercer, a business in Boyertown within Montgomery County.   *Id.* at ¶ 112.    Defendants similarly used the @votejoegale Instagram page to post regular content regarding Gale's viewpoints on political, social, and economic issues, many of which duplicated those posted to Defendants' Twitter and Facebook profiles.   On April 26, 2020, Defendants posted a photograph and associated comment in which Gale criticized Philadelphia Mayor Jim Kenney.  *Id.* at ¶ 113.

As of this filing, the Page remains active.

### B.  Commissioner Gale's June 1, 2020 Press Statement and his Blocking of Plaintiffs

On June 1, 2020, Defendants posted a document to the aforementioned Facebook, Twitter, and Instagram Pages entitled "Press Statement: Riots & Looting in Philadelphia." The Statement appeared on Montgomery County letterhead with Commissioner Gale's official title. *See* **Exhibit "A"** to Complaint. Commissioner Gale wrote (in pertinent part) that

> The perpetrators of this urban domestic terror are radical left-wing hate groups like Black Lives Matter. This organization, in particular, screams racism not to expose bigotry and injustice, but to justify the lawless destruction of our cities and surrounding communities. Their objective is to unleash chaos and mayhem without consequence by falsely claiming they, in fact, are the victims…

*Id.* The statement also characterized police brutality and white racism as "bogus narrative[s]." *Id.* Commissioner Gale released the statement on official Montgomery County letterhead, which bore his name, the official seal of Montgomery County, his title as "Commissioner," and his place on the "Board of Commissioners." *Id.* The bottom of the statement also provided his official governmental address (P.O. Box 311, Norristown, PA 19401-0311), and his official governmental e-mail address (joe@MontcoPa.org). *Id.*

Commissioner Gale's Press Statement drew immediate public condemnation, including widespread calls for Commissioner Gale's resignation.[5] Many constituents of Commissioner Gale and concerned citizens, including several Plaintiffs herein, responded to Commissioner Gale's statements on his social media Pages, both underneath the Press Statement he released there and underneath other posts in which he expressed opinions with which constituents disagreed.

When Defendants posted the Press Statement to Instagram on June 1, 2020, Plaintiff Gabrielle "Abby" Deardorff responded with "resign." *See* **Exhibit "C"** to Complaint. On June 2, 2020, when Commissioner Gale posted a statement to Instagram alleging that another Commissioner had displayed hypocrisy by not observing social distancing requirements, Plaintiff Deardorff responded with "She is a real leader. You are a racist. Resign." *Id.* On June 4, 2020, when Defendants tweeted "If black lives really mattered to Pennsylvania Governor Tom Wolf, he would not have volunteered at Planned Parenthood where he literally escorted innocent

---

[5] *See* Dan Sokil, *North Wales Council, Mayor Condemn Gale and Call for Resignation*, THE REPORTER (June 10, 2020), https://www.thereporteronline.com/news/north-wales-council-mayor-condemn-gale-and-call-for-resignation/article_a74449d8-ab37-11ea-beb3-ef689bada54d.html; Zachariah Hughes, *Hundreds Rally in Montco to Demand Commissioner Joe Gale's Resignation*, WHYY (June 4, 2020), https://whyy.org/articles/hundreds-rally-in-montco-to-demand-commissioner-joe-gales-resignation.

unborn children of all races to their murder," Plaintiff Deardorff replied "If you were really pro

life and not just pro white fetus, you wouldn't be such a racist." *See* **Exhibit "C."**

Following these posts, Plaintiff Deardorff subsequently found out that Defendants

thereafter blocked Plaintiff Deardorff from posting on any of his social media Pages.   Plaintiffs

D'Antonio, Hannock, Hayman, Hutchinson, Oteri, and Caroline & Co Media LLC d/b/a SAVVY

Main Line all had nearly identical experiences in which, after posting comments critical of

Commissioner Gale and his policies in the interactive portions of one or more of his social media

Pages, found themselves blocked from those pages. (Complaint, at ¶¶ 134-186).

Plaintiffs want to express their views by commenting on Defendants' social media Pages,

but are prevented from doing so because they have been blocked or banned.   That is

unconstitutional, and for the reasons set forth, should be immediately remedied.

### C.       Defendants' Deletion of Unfavorable Content

Not only did Defendants individually target and block users who disagreed with

Commissioner Gale, but they also ensured that many unfavorable comments or content posted to

Gale's Twitter, Instagram, and Facebook accounts were entirely disposed of so that others could

not see them.   Defendants selectively deleted a number of these comments so that users who

would otherwise be able to view all content on his accounts were no longer able to see those

comments expressing disagreement or opposition.   Upon information and belief, Defendants

continued this campaign of suppression after beginning his Instagram account in 2019.   They

systematically blocked Instagram users from accessing his @votejoegale account, and regularly

deleted comments from the accounts that Gale found unfavorable.

Plaintiff Elizabeth Brooks attempted to view Commissioner Gale's social media accounts

subsequent to the publication of the June 1, 2020 statement.   Upon so doing, she was unable to

view many of the critical comments, posts, and responses because they had been deleted from the profile.  This prevented her, and hundreds of other constituents and members of the public, from viewing the complete discourse that followed Gale's June 1 statement.

Defendants' actions violate Plaintiffs' rights under the First Amendment to the United States Constitution.  For the reasons set forth, injunctive relief should be immediately granted to Plaintiffs to remedy these violations.

### III.     LEGAL STANDARD

"In ruling on a motion for a preliminary injunction, the court must consider: (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest." *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 (3d Cir. 1994) (internal citations omitted). "It is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits." *Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975). For the same reasons that Plaintiffs' timely filing satisfies the threshold for preliminary injunctive relief, the peculiar harm at issue – Defendant's unbridled trampling of Plaintiff's First Amendment rights – similarly requires Court imposition of a Temporary Restraining Order. *See Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa. 1994) (standard for granting a Temporary Restraining Order under Federal Rule of Civil Procedure 65 is identical to the standard for issuing a Preliminary Injunction).

Plaintiffs' Complaint details Defendants' concerted efforts, over three distinct social media platforms, to purge unfavorable speech and to banish constituents who voice disfavored

viewpoints. Beyond Plaintiffs' clear proof of immediate irreparable denigration of their respective free speech rights, the need for a Temporary Restraining Order speaks to the immediate need to restore Plaintiffs' respective liberties, following the injuries which Defendants have caused by their actions in recent weeks. In this context, "[t]he timeliness of political speech is particularly important." *Elrod v. Burns*, 427 U.S. 347, 374 n.29 (1976). Accordingly, Plaintiffs' inability to engage with Defendants' cited social media platforms amounts to a "presently existing actual threat." *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 323 (3d Cir. 2013).

## IV.   ARGUMENT

### A.  Plaintiffs are Likely to Succeed on the Merits.

Plaintiffs bring their claims under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress….

42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution…." *Baker v. McCollan*, 443 U.S. 137, 145 n. 3 (1979); *see also Oklahoma City v. Tuttle*, 471 U.S. 808 (1985); *Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010).  To obtain relief under Section 1983, a plaintiff must prove that there was (1) "a violation of a right secured by the Constitution and laws of the United States," and that (2) "the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).

To determine whether a litigant has established a *prima facie* claim under Section 1983 for a violation of First Amendment rights, this court has followed the three-step analysis outlined by the Supreme Court in *Cornelius v. NAACP Legal Defense and Education Fund*, 473 U.S. 788, 797 (1985). *See Am. Freedom Def. Initiative v. SEPTA*, 92 F. Supp. 3d 314, 322 (E.D. Pa. 2015). Applying that analysis to the instant case, the first question is whether Plaintiffs' speech was protected by the First Amendment. *Id.* The second question is what type of forum was created in the interactive portion of Commissioner Gale's social media Pages, which establishes the level of judicial scrutiny to be applied to the Commissioner's actions. *Id.* The third and final question is whether Commissioner Gale's actions survive the applicable level of scrutiny. *Id.*

Plaintiffs' claims under Article I, Section 7 of the Pennsylvania Constitution follow a similar analysis. However, "Article I, § 7 'provides protection for freedom of expression that is broader than the federal constitutional guarantee.'" *Pap's A.M. v. City of Erie*, 812 A.2d 591, 606 (Pa. 2002) (quoting *Com., Bureau of Professional & Occupational Affairs v. State Bd. of Physical Therapy*, 728 A.2d 340, 343-44 (Pa. 1998)) (further citation omitted). Consequently, if government action in Pennsylvania has violated a plaintiff's rights under the First Amendment, it automatically violates the plaintiff's rights under Article I, Section 7 of the Pennsylvania Constitution as well. *Id.; see also One Three Five, Inc. v. City of Pittsburgh*, 951 F. Supp. 2d 788, 820 (W.D. Pa. 2013) (holding plaintiff shows likelihood of success on claim under Article I, § 7 where it shows likelihood of success on claim made under First Amendment).

### 1. Plaintiffs' Rights Under the First Amendment Have Been Violated.

#### a. Plaintiffs' Speech Is Protected by the First Amendment.

The protection of political speech is at the very core of the First Amendment's protection. As the U.S. Supreme Court has stated, "[w]hatever differences may exist about interpretations of

the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The Court has further stated that it has "long been settled" that the First Amendment protects an individual's right to express opinions on public questions. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 259 (1964). Similarly, in upholding the First Amendment right of a constituent to post on the Facebook Page of the chair of a county board of supervisors, the U.S. Court of Appeals for the Fourth Circuit noted that the constituent's speech "is not just protected speech, but lies at the very 'heart' of the First Amendment." *Davison v. Randall*, 912 F.3d 666, 716 (4th Cir. 2019).

Plaintiffs' speech in this case is protected by the First Amendment. Commissioner Gale's June 1 statement necessarily touched on matters of social policy and political discourse. By responding to Commissioner Gale's June 1 statement across his social media accounts, Plaintiffs D'Antonio, Deardorff, Hannock, Hayman, Hutchinson, Oteri, and SAVVY Mainline LLC sought to express their disagreement with the views he expressed on racial, social, and political grounds. Similarly, Plaintiff Brooks sought to participate in the political discourse regarding Commissioner Gale's political commentary by viewing all of the comments and content posted to Gale's social media pages, but was unable to do so due to Gale's selective deletion of content that he believed to be unfavorable to his own viewpoints. This type of expression "lies at the very heart of the First Amendment's protections." *Am. Freedom Defense Initiative*, 92 F. Supp. 3d at 322-23. Such actions and types of speech are wholly protected by the First Amendment, thus satisfying the first prong of the required test.

### b. *Commissioner Gale's Social Media Pages are Public Fora Properly Subjected to Forum Analysis.*

Whether Commissioner Gale has engaged in impermissible discrimination turns on the results of the "forum analysis" prescribed by the Supreme Court. *See Cornelius*, 473 U.S. at 800. To qualify as a public forum, and thus properly be so analyzed, a space must be owned *or controlled* by the government. *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 679 (2010) ("[T]his Court has employed forum analysis to determine when a governmental entity, in regulating property *in its charge*, may place limitations on speech.") (emphasis added.) Thus, a state actor may transform an otherwise "private property, whether tangible or intangible," into a public forum by its actions. *See Davison*, 912 F.3d at 683 (citing cases in which privately owned property was held to be a public forum for the purpose of First Amendment analysis.) Further, application of the forum doctrine must be consistent with the "purpose, structure, and intended use of the space." *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 565 (S.D.N.Y. 2018). In evaluating this issue, courts are to "focus[] on the access sought by the speaker." *Cornelius,* 473 U.S. at 801.

The Supreme Court has recently recognized the role played by social media as a forum for the exchange of ideas. "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general … and social media in particular." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (citation omitted, parentheticals in original). *See also Benner v. Wolf*, 2020 U.S. Dist. LEXIS 89425, *20) (M.D. Pa. May 21, 2020) ("In this era, cyberspace in general and social media in particular have become the lifeblood for the exercise of First Amendment rights.") (citation omitted.) Neither the Supreme Court nor the Third Circuit has yet had the occasion to apply forum analysis in the

context of a social media account maintained by a public official. Recent federal court decisions have, however, and have found that such an account constitutes a public forum, and is properly evaluated under forum analysis. Their reasoning is instructive.

In *Davison*, 912 F. 3d at 673, the chair of a county board of supervisors created a "Chair Phyllis J. Randall" Facebook Page. It was separate from her personal Facebook profile, and contained a "governmental official" designation. Randall used the page to notify the public about upcoming board meetings and the topics to be addressed. She also used the Page to inform residents about public safety issues, to urge constituents to attend public meetings, to publicize trips she had taken in furtherance of county business, and to advise the public regarding official actions. *Id.* at 673–74. Citizens were able to, and did, "like" and comment on Randall's posts. *Id.* at 674.

The Fourth Circuit concluded that the chair's Facebook Page was a public forum. *Id.* at 687. Among other factors, Randall had "clothed the page in the trappings of her public office." *Id.* at 683. Randall had designated the page as belonging to a "government official[]." *Id.* at 682 n.3. She had intentionally opened the public comment section of the page "for public discourse." *Id.* at 682 (citations omitted). She had placed no restrictions on the public's access or their "use of the interactive component" of the page, and the people made "numerous posts on matters of public concern." *Id.* And she had control over the page, including the right to ban participants and dictate their ability to participate in its interactive features. *Id.* at 684.

The Second Circuit reached a similar conclusion in *Knight First Amendment Institute*, when users alleged that President Donald Trump had violated their First Amendment rights by blocking them from participating in the interactive spaces of his @realdonaldtrump Twitter account. The court first found that the government-control prong of the test had been met, since

among other factors, President Trump "uses the account to take actions that can be taken only by the President as President." And the court upheld the District Court's ruling that the "interactive space" associated with each Tweet constituted a public forum for First Amendment purposes because it was a forum "in which other users may directly interact with the content of the tweets by . . . replying to, retweeting or liking the tweet." *Knight*, 928 F.3d at 233.   Of particular relevance to this case, the Court rejected the President's argument that his @realdonaldtrump Twitter account was a private social media account not subject to constitutional scrutiny— *despite* the fact that the President had maintained it as his private account before he took office. The Court held that the President had taken actions to convert @realdonaldtrump into a public forum by using the account "to take actions that can be taken only by the President as President." *Id.* By using his social media Pages to (among other things) issue press releases in his official capacity, on County letterhead, during business hours, Commissioner Gale has similarly used his accounts to take actions that can only be taken by a Commissioner as a Commissioner.

Commissioner Gale has "clothed [his] page in the trappings of [his] public office." *Davison,* 912 F. 3d at 683. Each Page features a photograph of Commissioner Gale speaking behind a podium bearing the official seal of Montgomery County. His Facebook Page is designated as a "Politician" page. He uses all three Pages to discuss County business and to encourage public support for his policies.  *See* Complaint at ¶¶ 78-116; 194-201. Commissioner Gale maintains control over the Pages, including the ability to ban members of the public. The interactive components of the Pages are widely used by constituents commenting on issues of public concern. Under these facts and the governing law, Commissioner Gale's social media Pages are properly considered public fora, and subject to the forum analysis enunciated by the Supreme Court.

2. *Defendants' Banning of Plaintiffs Constitutes Impermissible Content and Viewpoint Discrimination.*

    i.    **Defendants' Banning of Plaintiffs Constitutes Prohibited Viewpoint Discrimination.**

Three types of fora exist for purposes of a First Amendment claim. *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 679 n. 11 (2010). Regardless, however, of which type of forum Commissioner Gale's social media platforms are characterized as, Plaintiffs will prevail on the merits of their claims because Defendants engaged in viewpoint discrimination, which is impermissible in any forum.

"Viewpoint discrimination is . . . an egregious form of content discrimination" whereby "the government targets not subject matter, but particular views taken by speakers on a subject. . . ." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). Viewpoint discrimination "empowers the censor to deprive the citizen of the opportunity to persuade," and thus "violates the First Amendment's most basic promise." *Ne. Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 938 F.3d 424, 432 (3d Cir. 2019). And it is present whenever an official action restricting speech is "impermissibly motivated by a desire to suppress a particular point of view." *Cornelius,* 473 U.S. at 812-13. "Viewpoint-based restrictions are unconstitutional," and are prohibited in all fora. *Am. Freedom Defense Initiative*, 92 F. Supp. 3d at 324 (citing *Pittsburgh League of Young Voters*, 653 F.3d at 296); *Davison*, 912 F.3d at 687. "[I]f the government allows speech on a certain subject in any forum, it must accept all viewpoints on the subject, even those that it disfavors or finds unpopular." *Am. Freedom Defense Initiative*, 92 F. Supp. 3d at 324 (citing *Rosenberger*, 515 U.S. at 829; *Cornelius*, 473 U.S. at 806.)

In *Davison*, having determined that the interactive component of the Facebook page

before it constituted a public forum, the court observed that "would normally need to" determine which classification applied. *Id*. It found, however, that such exercise was unnecessary because by banning the plaintiff from the Facebook page—right after he had posted comments accusing board members of conflicts of interest—defendant had engaged in "'viewpoint discrimination,' which is 'prohibited in all forums.'" *Id.* (citations omitted). Similarly, in *Robinson v. Hunt County*, the Fifth Circuit held that "Because [the plaintiff banned from a public official's Facebook page] alleges viewpoint discrimination, it is immaterial whether the Facebook page is analyzed as a limited or designated public forum." *Robinson v. Hunt Cty.*, 921 F.3d 440, 448 (5th Cir. 2019).

Similar instances of viewpoint discrimination may occur where sheriff's deputies seized issues of a newspaper critical of the sheriff's performance of his duties, *Rossignol*, 316 F. 3d at 521, and where a municipality declined to link a newspaper website to its webpage because the newspaper sought to expose municipal corruption. *Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834, 846 (6th Cir. 2000). The appellate courts to consider the question have all held that a public official's banning or deleting the comments of critics from an official social media account constitutes impermissible viewpoint discrimination. *See Knight First Amendment Inst.*, 928 F.3d at 234 (holding that "in blocking the Individual Plaintiffs the President engaged in prohibited viewpoint discrimination"); *Davison*, 927 F. 3d at 687 (holding that "Randall's ban of Davison amounted 'viewpoint discrimination,' which is 'prohibited in all forums.'"); *Robinson*, 921 F.3d at 447 ("Official censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination").

Here, the common link between Plaintiffs D'Antonio, Deardorff, Hannock, Hayman, Hutchinson, Oteri, and SAVVY Mainline LLC is unmistakable.   Defendants blocked each

Plaintiff from Commissioner Gale's social media accounts after each Plaintiff commented their disagreement or dissatisfaction with the message set forth in his June 1 Press Statement and other political statements he made while clothed in the trappings of his office.  Similarly, Defendants engaged in viewpoint discrimination by deleting comments and content from Gale's official accounts that Defendants found unfavorable, while leaving numerous comments and content in place that they found favorable.  This precluded Plaintiff Brooks from viewing the complete discourse surrounding his June 1 Statement and giving Commissioner Gale the appearance of an entirely favorable reaction from the public to the same.  Like the public officials in the multiple cases cited *supra*, the sole reason for Defendants' restricting access to otherwise public fora was Commissioner Gale's own disagreement with the content posted by Plaintiffs, and his own desire to give the appearance of widespread support for his policies when no such support existed.

Defendants' exclusion of Plaintiffs from his otherwise public social media accounts constitutes viewpoint discrimination.  Such activity squarely violates the First Amendment rights of Plaintiffs.

ii.      **Commissioner Gale's Social Media Pages Are Designated Public For a**

If the Court conducts the forum analysis, the conclusion does not change.  Once a space is determined to be a public forum, the next step involves classifying it by type.  Traditional public fora are spaces, such as streets and parks, that "by long tradition . . . have been devoted to assembly and debate." *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).  "A second category consists of public property which the State has opened for use by the public as a place for expressive activity." *Id.*  Such a forum is called a "designated public forum," which the government creates by "intentionally opening a nontraditional forum for public discourse." *Cornelius,* 473 U.S. at 802; *Pittsburgh League of Young Voters Educ. Fund v.*

*Port Auth.*, 653 F.3d 290, 296 (3d Cir. 2011). "Restrictions on speech in public and designated public fora are reviewed under strict scrutiny." *NAACP v. City of Phila.*, 39 F. Supp. 3d 611, 618 (E.D. Pa. 2014).

In *Knight First Amendment Institute,* the Second Circuit held that Donald Trump's @realdonaldtrump Twitter account was a designated public forum because "[t]he Account was intentionally opened for public discussion when the President, upon assuming office, repeatedly used the Account as an official vehicle for governance and made its interactive features accessible to the public without limitation." *Knight First Amendment Inst.,* 928 F.3d at 237.

These factors compel a similar conclusion here. Commissioner Gale's social media Pages are accessible to the public at large, without limiting criteria. Members of the public, unless banned, may participate in the interactive portions of the Pages, and thus participate in the exchange of views and perspectives. The Pages are held out, and used, as a means by which Commissioner Gale communicates with his constituents and enlists their support.  And they are eminently compatible with expressive activity. *See Packingham*, 137 S. Ct. at 1735, 1737 (describing the internet in general, and social media in particular, as "the most important places. . . for the exchange of views," as the latter "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," in part, because these platforms permit citizens to petition their elected officials "and otherwise engage with them in a direct manner"). Commissioner Gale's social media Pages are thus appropriately deemed designated public fora, where any content-based restrictions are subject to strict scrutiny.

### iii.    <u>The Bans Cannot Survive Strict Scrutiny</u>

Under the two grounds discussed above—content-based restrictions in a designated forum and viewpoint discrimination—the banning of Plaintiffs from the interactive spaces on

Commissioner Gale's social media Pages must be subjected to strict scrutiny. "To survive strict scrutiny analysis, a statute must: (1) serve a compelling governmental interest; (2) be narrowly tailored to achieve that interest; and (3) be the least restrictive means of advancing that interest." *ACLU v. Mukasey*, 534 F.3d 181, 190 (3d Cir. 2008).   Thus, Defendants' prohibition of Plaintiffs' speech violates the First Amendment unless they establish a compelling state interest in the restriction, and proves that the restriction is drawn narrowly to meet that interest. *Id.*

Defendants will be unable to meet this burden.  There is little justification—much less a compelling governmental interest—for silencing critical voices from an ongoing debate on matters of public policy and governmental conduct. And whatever interest might be conjured under these circumstances, a wholesale banning of them from "the most important place[]  . . . for the exchange of views," *Packingham,* 137 S. Ct. at 1735, cannot be deemed as narrowly drawn to meet that interest.   After all, "[w]here the State has opened a forum for direct citizen involvement, it is difficult to find justification for excluding … [those] who are most vitally concerned with the proceedings." *City of Madison, Joint Sch. Dist. No. 8 v. Wis. Employment Relations Comm'n*, 429 U.S. 167, 175 (1976).  Giving substance to a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open," *Watts v. United States*, 394 U.S. 705, 708 (1969), the First Amendment assures the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957).

Plaintiffs are therefore likely to prevail on their claim that by banning them from the interactive portions of Commissioner Gale's official social media pages, Defendants have violated their rights under the First Amendment.

### 3.   *Commissioner Gale Acted Under Color of State Law.*

Noting that the Supreme Court has not established any "definitive state action formula," the Third Circuit has held that "the presence or absence of state action must be determined on a case-by-case basis" after a "detailed inquiry" into the facts. *Magill v. Avonworth Baseball Conf.*, 516 F.2d 1328, 1332 (3d Cir. 1975). Generally speaking, a public employee "acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."   *West v. Atkins*, 487 U.S. at 50. State employees who are "off duty" nonetheless generally still act under color of state law if they "purport to exercise official authority," *Barna v. City of Perth Amboy*, 42 F.3d 809, 816 (3d Cir. 1994), particularly if that pretense "had the purpose and effect of influencing the behavior of others." *Washington-Pope v. City of Philadelphia*, 979 F. Supp. 2d 544, 562 n.4 (E.D. Pa. 2013); *see also Rossignol v. Voorhaar*, 316 F.3d 516, 524 (4th Cir. 2003) (state action found where official took actions "to suppress speech critical of his conduct of official duties. . . ").

Under this authority, Commissioner Gale was acting under color of state law. His social media Pages feature photographs of Gale speaking from behind a podium bearing the official County seal, graphics stating "Joe Gale, Montgomery County Commissioner," Press Statements issued on official County stationery, and numerous videos of Gale addressing the public and the media in his capacity as County Commissioner. No private citizen could have used the page in the manner that Commissioner Gale does. The Page is used to convey messages directly related to Commissioner Gale's official functions, and since it is used to encourage supporters to take specific actions (such as by encouraging voting in-person rather than by mail and by endorsing other candidates for office), it has "the purpose and effect of influencing the behavior of others," *Washington-Pope*, 979 F. Supp. 2d at 562 n.4.

Moreover, Commissioner Gale's publication of his June 1 statement, which directly led to the actions violative of Plaintiffs' First Amendment rights in this case, was action taken under the color of state law.  Commissioner Gale published the statement on letterhead bearing his title as Commissioner and the official Montgomery County seal.  *See* **Exhibit "A."** He further ascribed the official address of his office and e-mail address as Commissioner to the bottom of the statement.  *Id.*  He also posted the June 1 statement during regular business hours on a weekday, during a time when he was most likely to be exercising his official duties. *See* Complaint at ¶¶ 125-133.  The statement, therefore, left little doubt that Commissioner Gale "purport[ed] to exercise official authority" when he published the statement, thus conclusive evidence that intended to act under his color of his office.  *See Barna*, 42 F.3d at 816.  And, because Commissioner Gale blocked the access of Plaintiffs D'Antonio, Deardorff, Hannock, Hayman, Hutchinson, Oteri, and SAVVY Mainline LLC in response to their comments that were critical of him as Commissioner, and prevented Plaintiff Brooks from viewing the complete discourse relating to his statement by deleting comments and content from his official social media accounts that he objected to, the harm caused to Plaintiffs "related in some meaningful way…to the performance of his duties." *Washington-Pope*, 979 F. Supp. 2d at 567.

Commissioner Gale's amending his social media accounts after the June 1 Statement to allege that they were his "private" accounts not affiliated with his duties as a Commissioner do not change this outcome.  Such actions are irrelevant to the test of whether he acted under color of state law at the time of the alleged abridgement.  When he published his June 1 Statement, and when he censored statements disagreeing with it, Commissioner Gale was acting within a forum that he had previously used in his official capacity and designated as open for public consumption and comment.

The evidence, therefore, conclusively demonstrates that Gale acted under color of state law when he published the June 1 statement, in his actions to block Plaintiffs' access to his unencumbered social media accounts, and at all times when maintaining the accounts.  Plaintiffs, therefore, have demonstrated a likelihood of success on the merits of their claims.

### B.  Plaintiffs Will Suffer Irreparable Harm Absent an Injunction

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976); *see also K.A. v. Pocono Mt. Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013). Such harm is all the more irreparable where, as here, a plaintiff seeks to engage in political speech, as "[t]iming is of the essence in politics." *Long Beach Area Peace Network v. City of Long Beach*, 522 F. 3d 1010, 1020 (9th Cir. 2008) (quoting *NAACP. v. City of Richmond*, 743 F. 2d 1346, 1356 (9th Cir. 1984)).

Because Plaintiffs are suffering, and will continue to suffer, ongoing loss of their First Amendment right to comment and participate in the fora established by Commissioner Gale's social media Pages, they have demonstrated a likelihood of irreparable injury in the absence of an injunction.

### C.  Defendants Will Not Suffer Irreparable Harm if the Injunction is Issued

The balance of hardships tips in favor of Plaintiffs and the injunction that they seek.  This prong requires a determination of "whether granting preliminary relief will result in even greater harm to the nonmoving party."  *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999).

Granting the preliminary injunction will ensure that Plaintiffs will not suffer further curtailment of their guaranteed rights under the First Amendment.  In contrast, there is no

evidence of hardship that Defendants will suffer if Plaintiffs' rights to participate in the fora they established are restored.  Nor can Commissioner Gale truly claim an interest in continuing an unconstitutional practice.  *See ACLU v. Ashcroft*, 322 F.3d 240, 251 n. 11 (3d Cir. 2003).  To the extent Commissioner Gale or others disagree with comments made by Plaintiffs, the solution is to engage debate, counterpoint, and commentary.  The balance of harms, and therefore this prong of the analysis, weighs heavily in favor of Plaintiffs.

### D.  The Public Interest Will Be Served by the Issuance of an Injunction.

Finally, an injunction in this case will directly serve the public interest.  "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."  *Am. Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 n. 8 (3d Cir. 1994); *Am. Freedom Defense Initiative*, 92 F. Supp. 3d at 330.  Further, numerous courts hold that "there is a significant public interest in upholding First Amendment principles."  *Id.*; *Ramsey v. City of Pittsburgh*, 764 F.Supp.2d 728, 735 (W.D. Pa. 2011); *Iowa Right to Life Comm'e., Inc v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999); Elam Constr., Inc. v. Regional Transp. Dist., 129 F.3d 1343, 1347 (10th Cir. 1997) (further citation omitted).

The public interest in upholding the First Amendment is present in this case. Commissioner Gale's impermissible violation of Plaintiffs' First Amendment rights harms the public at large, as it prevents free speech and complete discourse of political ideas and thought. That is particularly the case here, as the injunction requested will ensure that Gale immediately ceases the practice of selectively deleting comments or content that he finds objectionable.  This will ensure free and unfettered access to his thoughts and opinions as an elected official by the public.  This factor too weighs heavily in favor of injunctive relief.

IV.     CONCLUSION

Plaintiffs are likely to succeed on the merits of their claims.   So too have they demonstrated a likelihood of irreparable injury, a public interest supporting an injunction, and a balance of hardships that tips in their favor.   For these reasons, a preliminary injunction should be issued directing Defendants to return Plaintiffs to the "unbanned" or "unblocked" status they previously enjoyed on Defendants' social media accounts, retain them in "unbanned" status, and immediately cease further actions to delete or remove commentary from these social media accounts that they find objectionable.   Plaintiffs' Motion should be granted in all respects.

Respectfully Submitted:

**WALSH PANCIO, LLC**

BY: _____
    Joseph P. Walsh, Esquire
    Michael J. Lyon, Esquire
    I.D. No. 64352/306519
    2028 North Broad Street
    Lansdale, PA  19446-1004

**PHILIP PRESS LAW OFFICE**

BY: __/s/ Philip Press_____
    Philip Press, Esquire
    I.D. No. 306374
    30 West Airy Street
    Norristown, PA 19401

**MUDRICK & ZUCKER, P.C.**

BY: _____
    Adam Zucker, Esquire
    Samantha Harris, Esquire
    I.D. No.
    325 Sentry Parkway
    Building 5 West, Suite 320
    Blue Bell, PA 19422