**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

———————————————————————

|  |  |  |
|---|---|---|
| **GABRIELLE DEARDORFF, BRYAN OTERI, CAROLINE & CO. MEDIA LLC, d/b/a SAVVY MAIL LINE, MONICA D'ANTONIO, ELAINE HANNOCK, KAREN HAYMAN, ZAK HUTCHINSON, and ELIZABETH C. BROOKS,** | : | |
| Plaintiffs | : | **Civil Action No. 20-03172** |
| | : | |
| v. | : | |
| | : | |
| **JOSEPH C. GALE, Individually and in His Official Capacity as Commissioner of Montgomery County, PA; and FRIENDS OF JOE GALE** | : | |
| Defendants | : | |

———————————————————————

# O R D E R

**AND NOW**, this _____ day of _____, 2020, upon consideration of the Motion of Defendant Joseph C. Gale, in his Official Capacity only, for Partial Dismissal of Plaintiffs' Complaint, and any response by Plaintiffs thereto, it is hereby **ORDERED** and **DECREED** that said motion is **GRANTED** as follows:

1.      Plaintiffs' Complaint is **DISMISSED WITH PREJUDICE** as to all claims brought against Defendant Joseph C. Gale, in his Official Capacity; and further

2.      The Plaintiffs' prayer for punitive damages as to Defendant Joseph C. Gale in his Official Capacity is **STRICKEN WITH PREJUDICE**.

BY THE COURT:

_____
U.S.D.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| **GABRIELLE DEARDORFF, BRYAN** | : | |
| **OTERI, CAROLINE & CO. MEDIA LLC,** | : | |
| **d/b/a SAVVY MAIL LINE,** | : | |
| **MONICA D'ANTONIO, ELAINE** | : | |
| **HANNOCK, KAREN HAYMAN,** | : | |
| **ZAK HUTCHINSON, and ELIZABETH C.** | : | |
| **BROOKS,** | : | |
| Plaintiffs | : | **Civil Action No. 20-03172** |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH C. GALE, Individually and in** | : | |
| **His Official Capacity as Commissioner of** | : | |
| **Montgomery County, PA; and FRIENDS** | : | |
| **OF JOE GALE** | : | |
| **Defendants** | : | |

_____:

## MOTION OF DEFENDANT JOSEPH C. GALE,
## IN HIS OFFICIAL CAPACITY ONLY,
## <u>FOR PARTIAL DISMISSAL OF PLAINTIFFS' COMPLAINT</u>

Defendant Joseph C. Gale (hereinafter "Commissioner Gale"), in his official capacity only, through the undersigned counsel, hereby moves this Honorable Court for the partial dismissal of Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Specifically, Commissioner Gale respectfully asks that all claims brought against him in his official capacity be dismissed with prejudice; and further, that Plaintiffs' prayer for punitive damages against him, in his official capacity, be stricken with prejudice. The factual basis,

controlling authorities and arguments supporting this motion are set forth more completely in the

accompanying memorandum of law, which are incorporate herein by reference.

Respectfully submitted,

MONTGOMERY COUNTY SOLICITOR'S OFFICE

*/s/  Milton Vélez*
Milton Vélez, Esquire
One Montgomery Plaza, Suite 800
P.O. Box 311
Norristown, PA  19404-0311
610-278-3033

Counsel for Defendant,
Joseph C. Gale,
in his Official Capacity only

Dated:  July 23, 2020

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| GABRIELLE DEARDORFF, BRYAN OTERI, CAROLINE & CO. MEDIA LLC, d/b/a SAVVY MAIL LINE, MONICA D'ANTONIO, ELAINE HANNOCK, KAREN HAYMAN, ZAK HUTCHINSON, and ELIZABETH C. BROOKS, : | : |
| Plaintiffs : | **Civil Action No. 20-03172** |
| : | |
| v. : | |
| : | |
| JOSEPH C. GALE, Individually and in His Official Capacity as Commissioner of Montgomery County, PA; and FRIENDS OF JOE GALE : | |
| Defendants : | |

_____:

**MEMORANDUM OF LAW IN SUPPORT OF
THE MOTION OF DEFENDANT
JOSEPH C. GALE, IN HIS OFFICIAL CAPACITY ONLY,
FOR THE PARTIAL DISMISSAL OF PLAINTIFFS' COMPLAINT**

**I      INTRODUCTION AND FACTUAL BACKGROUND**

In this action seven individuals and one business bring suit against Montgomery County Commissioner Joseph C. Gale and an organization identified as Friends of Joe Gale.  *See* ¶¶ 11 – 38 of Plaintiffs' Complaint attached as <u>Exhibit A</u>.  In Count I the Plaintiffs collectively seek injunctive relief for the alleged violation of their First Amendment rights pursuant to § 1983. ¶¶ 201 – 209.  In Count II Plaintiffs claim violation of their "free exercise of speech and/or to freedom of expression" pursuant to the Pennsylvania state Constitution.  ¶¶ 210 – 218.  Last, at Count III Plaintiffs seek Declaratory Relief that "An actual, immediate, justiciable, and present controversy exists between Plaintiffs on the one hand, and on Defendants on the other,

concerning Plaintiffs' rights to participate in public debate by posting, responding, accessing, and commenting upon Gale's activities and posts on his official social media accounts." ¶ 220.

## II   STANDARD OF REVIEW

Under the Supreme Court's bellwether decision in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is appropriate if, accepting as true all of the facts alleged in the complaint, the plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 570. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation [under Rule 8(a)(2)] to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and the formulaic recitation of the elements of a cause of action will not do." *Id.* at 555-56 (citations omitted). To survive a motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.* at 555. A plaintiff must have "nudged [his] claim across the line from conceivable to plausible, or [his] complaint must be dismissed." *Id.* at 570.

Under *Twombly*, conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly,* 550 U.S. at 557). To prevent dismissal, the complaint must set out "sufficient factual matter" to show that the claim is facially plausible. *Iqbal,* 556 U.S. at 678.

Analyzing *Twombly* and *Iqbal*, the Third Circuit has offered the following analysis of the process to be undertaken in deciding a motion to dismiss:

2

> Therefore, after *Iqbal*, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. *Id.* Second, a district court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' *Id.* at 1950. In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts. *See Phillips v. County of Allegheny*, 515 F.3d 224, 234-35. As the Supreme Court instructed in *Iqbal*, '[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.' ' *Iqbal*, 129 S.Ct. at 1949. This 'plausibility' determination will be 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' *Id*.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Applying this standard, Commissioner Gale's motion for partial dismissal of Plaintiffs' complaint should be granted in its entirety.

## III    LEGAL ARGUMENT

### A.    Plaintiffs' Official Capacity Claims Against Commissioner Gale Fail Because Plaintiffs Do Not Allege Sufficient Facts To State A Plausible § 1983 Claim Under *Monell*

Plaintiffs indicate in the caption of this suit that they are suing Commissioner Gale in both his individual capacity and his official capacity. *See* Plaintiffs' Complaint. Further, they alleged that in his official capacity he "maintained the Facebook, Twitter, and Instagram profiles" which are the subject of this litigation. Complaint at ¶ 39.

In the seminal decision of *Kentucky v. Graham*, 473 U.S. 159 (1985), the Supreme Court eliminated any lingering confusion about the distinction between individual and official capacity claims. In so doing, the Supreme Court stated that official capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Id*. at

3

165.   Claims against government officials in their official capacity, therefore, are treated as claims against the governmental entity.   *Id*. at 166.   In this matter, that entity would be the County of Montgomery.   *In accord*,   *Hafer v. Melo*, 302 U.S. 21, 25 (1991).

Under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), a plaintiff may maintain a § 1983 action against a local government entity only where the entity's own "policy or custom" causes a deprivation of the plaintiff's constitutional rights.   436 U.S. at 694 (a local government has no vicarious or *respondeat superior* liability under § 1983; liability can only arise from the government's own policy or custom).   A local government's "policy" is a "statement, ordinance, regulation or decision officially adopted and promulgated by [a local governing] body's officers."   *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1059 (3d Cir.1991) (citing *Monell*, 436 U.S. at 690).   A local government's "custom," which lacks the formal approval of a policy, requires a showing of practices that are "so permanent and well settled to constitute a custom or usage with the force of law."   *Id.* (citing *Monell*, 436 U.S. at 691).

The local government's policy or custom must be the "moving force" behind the constitutional deprivation if the local government is to be held liable.   *Kentucky v. Graham,* 473 U.S. 159, 166 (1985); *Grazier v. City of Philadelphia*, 328 F.3d 120, 125 (3d Cir. 2003).   There must be "a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation' to ground municipal liability."   *Jiménez v. All American Rathskeller, Inc.,* 503 F.3d 247, 249-50 (3d Cir. 2007) (quoting *City of Canton v. Harris,* 489 U.S. 378, 385 (1989)).

In the present case, Plaintiffs' complaint alleges no facts to demonstrate it is plausible that any constitutional rights of the various Plaintiffs were infringed because of a policy or

custom of <u>Montgomery County</u>.  Plaintiffs have failed to allege anywhere in their lengthy complaint that Montgomery County operated, maintained or controlled any of the social media accounts which are at the center of this litigation.  To the contrary, Plaintiffs aver at ¶ 4 that "During his time as Commissioner, Gale has maintained a number of social media accounts, including, but not limited to, a Facebook page, a Twitter account, and an Instagram account." Similarly, Plaintiffs do not allege, suggest or even imply that a specific <u>Montgomery County</u> policy was involved in the purported violation of their constitution rights. Without stating such facts and/or identifying a policy or custom, Plaintiffs cannot maintain a § 1983 claim against Commissioner Gale in his official capacity.  Thus, all claims against him in his official capacity should be dismissed.

> **B.** **Plaintiffs' Official Capacity Claims Against Commissioner Gale Must Fail Because Acting Alone He Cannot Make Policy <u>To Support A Plausible § 1983 Claim Under *Monell*</u>**

To the extent that Plaintiffs' complaint attempts to argue or suggest that Commissioner Gale's alleged acts and actions constitute a county policy or custom, they are mistaken and contrary to existing court decisions.

The question of whether a single county commissioner can establish policy for purposes of a § 1983 suit was addressed in *LaVerdure v. County of Montgomery*, 2002 WL 32349386.  In a well-reasoned opinion, Judge Bartle unequivocally determined a commissioner could not establish policy when acting alone.  He reasoned that:  "Under state law, the corporate power of a county is vested in a Board of three county commissioners elected by the voters to four-year terms. . . Two commissioners are necessary to constitute a quorum to transact business. [Citation omitted] Any official document, instrument or official paper must be executed by at least two commissioners."  *Id*. at *2 (Citations omitted).  *See also*, *City of St. Louis v. Praprotnik*, 485 U.S.

112, 123 (1988)(Only officials who have final policy making authority "may by their actions subject the government to § 1983 liability.") and <u>Holt Cargo Systems, Inc. v. Delaware River Port Authority</u>, 20 F.Supp.2d 803, 840-41 (E.D.Pa. 1998) (Since policy decisions require 5 votes from the 8 Pennsylvania representatives, as well as 5 votes from the 8 New Jersey representatives, allegedly improper motivation of only 2 representatives could not be imputed to the entire DRPA.).

Judge Bartle's decision was subsequently appealed and affirmed by a panel of the Third Circuit.  Writing for the panel, Circuit Judge Abro succinctly stated: "It is undisputed that only a majority of the three-member Board is authorized to establish policy on behalf of the County. [Citation omitted] Therefore, whatever the contents of [Commissioner] Marino's statements, because he was only one member of the Board, those comments do not constitute County policy." *LaVerdure v. Cty of Montgomery*, 324 F.3d 123, 125 (2003).

Applying the same Pennsylvania state law and controlling federal decisions to the matter *sub judice*, a similar determination should be reached here.  Commissioner Gale, acting alone cannot create policy for Montgomery County.  If in their complaint Plaintiffs cannot point to a specific County  policy or custom involved in the alleged violation of their constitutional rights, <u>which they have failed to do</u>, they cannot maintain a valid § 1983 claim against Commissioner Gale in his official capacity.  Thus all purported claims against him in his official capacity should be dismissed.

    C.    **Plaintiffs' Prayer for Punitive Damages Against Commissioner Gale in his Official Capacity Must Be Stricken**

In their Prayer for Relief at item (e), Plaintiffs request this Honorable Court to:  "Award Plaintiffs nominal, compensatory, and punitive damages in an amount exceeding the

jurisdictional limits of this Court . . ." Such a request cannot be granted as it is contrary to existing case law.

For at least 170 years, local government agencies in Pennsylvania have been immune from punitive damages.  This immunity from punitive damages is well-demonstrated by the United States Supreme Court's decision in *City of Newport v. Fact Concerts, Inc*., 453 U.S. 247 (1981), where the Court held that municipal governments could not be liable for punitive damages under 42 U.S.C. § 1983 – a federal statute creating a civil cause of action for violations of constitutional rights.  To reach its conclusion in *Newport*, the Court began by acknowledging "that municipal immunity from punitive damages was well established at common law" for more than a century.  453 U.S. at 263.  Importantly here, the Court in *Newport* focused upon an 1847 decision of our Pennsylvania Supreme Court:

> Of particular relevance to our current inquiry is *Order of Hermits of St. Augustine* v. *County of Philadelphia,* [4 Clark 120, Brightly N. P. 116 (Pa. 1847)], which involved a Pennsylvania statute that authorized property owners within the county to bring damages actions against it for the destruction of their property by mob violence. The court observed that the 'persons' against whom the statute authorized recovery included the county corporation, and it held that plaintiffs were entitled to compensatory damages as part of the county's duty to make reparation to its citizens for injuries sustained as a result of lawless violence. While noting that punitive damages would have been available against the rioters themselves, the court nonetheless held that such exemplary damages were not recoverable against the county.

*Newport*, 453 U.S. at 262.  The *Order of Hermits* case demonstrates that, since at least 1847, counties in Pennsylvania have been immune from punitive damages – even where a statute expressly creates a cause of action against the county for which punitive damages otherwise may be recoverable.

The rationale for immunizing counties and other government agencies from punitive damages awards is compelling.  As the United States Supreme Court explained in *Newport*:

7

> In general, courts viewed punitive damages [against government agencies] as contrary to sound public policy, because such awards would burden the very taxpayers and citizens for whose benefit the wrongdoer was being chastised. The courts readily distinguished between liability to compensate for injuries inflicted by a municipality's officers and agents, and vindictive damages appropriate as punishment for the bad-faith conduct of those same officers and agents. Compensation was an obligation properly shared by the municipality itself, whereas punishment properly applied only to the actual wrongdoers. The courts thus protected the public from unjust punishment, and the municipalities from undue fiscal constraints.

*Newport*, 453 U.S. at 263.  The Court in *Newport* further elaborated:

> Regarding retribution, it remains true that an award of punitive damages against a municipality 'punishes' only the taxpayers, who took no part in the commission of the tort. These damages are assessed over and above the amount necessary to compensate the injured party. … Indeed, punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or reduction of public services for the citizens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers.

*Newport*, 453 U.S. at 267 (internal citation omitted).

A municipality can only act through its officials.  Thus, an award of punitive damages against a municipal entity itself cannot, by definition, satisfy the retributive and deterrent purposes of punitive damages.  The award is not borne by the offending officials but instead falls upon the taxpayers, who took no part in the commission of the tort.  Rather than advancing the public interest by punishing wrongdoers, such an award instead ultimately punishes the public through increased taxes, reductions in public services, or both.

The Pennsylvania Supreme Court has fully adopted the reasoning of *Newport*, echoing that an award of punitive damages against a government agency "cannot stand because it exacts retribution on the shoulders of blameless or unknowing taxpayers who would bear the brunt of the award." *City of Philadelphia Office of Housing & Cmty Dev. v. AFSCME,* 583 Pa. 121, 876 A.2d 375, 378 (2005) (citing *Feingold v. Southeastern Pennsylvania Transportation Authority,*

512 Pa. 567, 517 A.2d 1270, 1276-77 (1986)).  The Pennsylvania Supreme Court thus has declared it to be "against the public policy of our Commonwealth" to award punitive damages against a government agency because "punitive damages imposed on a municipality [a]re, in effect, a windfall to a fully compensated plaintiff and are likely accompanied by an increase in taxes or a reduction of public services[.]" *Philadelphia Office of Housing & Cmty Dev.,* 876 A.2d at 378.

Pennsylvania's intermediate appellate courts have followed suit, repeatedly finding that government agencies are exempt from the imposition of punitive damages. *See, e.g., SEPTA v. City of Philadelphia,* 122 A.3d 1163, 1172 (Pa. Cmwlth. 2015) ("punitive damages cannot be recovered from Commonwealth agencies"); *Pa. Turnpike Comm'n v. Teamsters L.U. 77*, 87 A.3d 904, 914 (Pa. Cmwlth. 2014) (an arbitrator's award imposed "not to make members whole for lost wages, but to punish the Commission's behavior … impermissibly assessed punitive damages against the Commission with the effect of punishing taxpayers"); *Rhoads v. Philadelphia Housing Authority*, 978 A.2d 431, 433 (Pa. Cmwlth. 2009) ("the Supreme Court has specifically declared that such damages are not recoverable against an authority that is an agency of the Commonwealth").

Consequently, punitive damages against Commissioner Gale in his official capacity are not recoverable in this action.


**IV     CONCLUSION**

For the factual reasons argued above and pursuant to the controlling decisions, all of Plaintiffs claims against Commissioner Gale in his official capacity only must be dismissed. Such claims are essentially claims against Montgomery County.   In this case Plaintiffs'

complaint does not set forth any facts or specify any county policy or custom as the cause of their alleged constitutional violation to support an action under § 1983.  So too, as a matter of law any alleged actions of Commissioner Gale acting alone do not constitute a county policy or custom. As a result, all allegations against Commissioner Gale in his official capacity must be dismissed.

Respectfully submitted,
MONTGOMERY COUNTY SOLICITOR'S
OFFICE


*/s/  Milton Vélez*
Milton Vélez, Esquire
One Montgomery Plaza, Suite 800
P.O. Box 311
Norristown, PA  19404-0311
610-278-3033

Counsel for Defendant,
Joseph C. Gale,
in his Official Capacity only


Dated:  July 23, 2020

# **CERTIFICATE OF SERVICE**

I, Milton Vélez, hereby certify that a true and correct copy of the Motion of Defendant

Joseph C. Gale, in his Official Capacity Only, for Partial Dismissal of Plaintiffs' Complaint

was served on the 23rd day of July, 2020, via electronic notification through the Court's ECF

System, upon the following counsel of record:

Joseph P. Walsh, Esquire
Michael J. Lyon, Esquire
2028 North Broad Street
Lansdale, PA 19446-1004

Philip Press, Esquire
30 West Airy Street
Norristown, PA 19401

Adam Zucker, Esquire
Samantha Harris, Esquire
325 Sentry Parkway
Building 5 West, Suite 320
Blue Bell PA 19422

*/s/ Milton Vélez*

**Milton Vélez, Esquire**

# **<u>EXHIBIT A</u>**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

GABRIELLE DEARDORFF, BRYAN   :
OTERI, CAROLINE & CO MEDIA LLC,  :
d/b/a SAVVY MAIN LINE,                  :
MONICA D'ANTONIO, ELAINE        :
HANNOCK, KAREN HAYMAN,       :
ZAK HUTCHINSON, and ELIZABETH C. :
BROOKS,                       :      NO.
                                :
             *Plaintiffs*   :
    v.                        :
                             :
JOSEPH C. GALE, Individually and in  :
His Official Capacity as Commissioner of :
Montgomery County, PA; and FRIENDS :
OF JOE GALE,                  :
            *Defendants*  :

## COMPLAINT

COME NOW, Plaintiffs Gabrielle Deardorff, Bryan Oteri, Caroline & Co Media LLC d/b/a

SAVVY Mainline LLC, Monica D'Antonio, Elaine Hannock, Karen Hayman, Zak Hutchinson,

and Elizabeth C. Brooks and state as their Complaint for Relief:

## INTRODUCTION

1.     Defendant Joseph C. Gale ("Gale" or "Commissioner Gale") is an elected official,

having served as a Commissioner of Montgomery County, PA since 2015.

2.     Gale was elected as a Commissioner of Montgomery County in November of 2015

and sworn into office in January 2016.

3.     Thereafter, Gale was re-elected in November of 2019 and sworn into office for a

second term in January 2020.

4.     During his time as Commissioner, Gale has maintained a number of social media

accounts, including, but not limited to, a Facebook page, a Twitter account, and an Instagram

account, where he regularly communicates information regarding official government business and

policy to his followers and invites comments.

5. Gale has frequently used these accounts to express his own views regarding political, governmental, and, most recently, social issues.

6. However, in a blatant effort to chill speech and suppress what has become regular opposition or dissent to his views, Defendants have excluded or blocked a number of users, including Plaintiffs, from access to his social media accounts, merely because Defendants disagree with the viewpoints these users have expressed. Defendants have also removed comments and dialogue, expressing viewpoints that he personally finds objectionable, preventing other Montgomery County residents and social media users from full consumption and viewing of that dialogue.

7. Defendants have not only engaged in impermissible viewpoint discrimination by blocking users from these social media accounts, they have also deprived any individual visiting these pages of their right to read the speech of the dissenters who have been blocked.

8. These practices are entirely unconstitutional under the First Amendment to the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution.

9. Plaintiffs, therefore, file this lawsuit to restore their constitutional rights, redress Defendants' blatant violation of them, and order Defendants to restore their access and to ensure that the platform for free speech and recognition that he created remains available to all.

10. To be clear, there can be no question that Gale has an unfettered, unencumbered right to express his own viewpoints. This lawsuit does not seek to change that. It simply demands that Defendants extend the same protection to those individuals who enjoy the same exact rights, and to immediately cease their own actions to abridge them.

## **THE PARTIES**

11. Plaintiff Gabrielle Deardorff is an adult individual who resides in Limerick

Township, Montgomery County, PA.

12. At all times relevant to the allegations in this Complaint, Plaintiff Deardorff was, and continues to be, a resident of Montgomery County and was, and continues to be, similarly a constituent of Commissioner Gale.

13. Plaintiff Deardorff operates a Facebook account at facebook.com/abby.a.deardorff, a Twitter account under the handle @gabriellemaryrn, and/or an Instagram account under the handle @gabriellemaryrn.

14. Plaintiff Bryan Oteri is an adult individual who resides in Lower Gwynedd Township, Montgomery County, PA.

15. At all times relevant to the allegations in this Complaint, Plaintiff Oteri was, and continues to be, a resident of Montgomery County and was, and continues to be, similarly a constituent of Commissioner Gale.

16. Plaintiff Oteri maintains a Twitter account under the handle @OT_b1, and an Instagram account under the handle @ohhhhhteeeee.

17. Plaintiff Caroline & Co Media LLC d/b/a SAVVY Mainline LLC ("SAVVY") is a Pennsylvania registered limited liability company with a principal place of business located in Tredyffrin Township, Chester County, PA.

18. SAVVY is a monthly online publication that regularly reports on events, activities, news items, and other items of interest in Montgomery County and the Main Line of Philadelphia. A substantial portion of the subscriber base and readership that Plaintiff SAVVY publishes to resides in Montgomery County.

19. Plaintiff SAVVY maintains a Facebook account at facebook.com/SAVVY-Main-Line-6522991115682367/, a Twitter account under the handle @SAVVYMainLine, and/or an Instagram account under the handle @savvymainline.

20.     Plaintiff Monica D'Antonio is an adult individual who resides in West Norriton Township, Montgomery County, PA.

21.     Plaintiff D'Antonio is Associate Professor of English at Montgomery County Community College and serves as a member of the Norristown Area School Board.  She also serves on the West Norriton Human Relations Commission.

22.     At all times relevant to the allegations in this Complaint, Plaintiff D'Antonio was, and continues to be, a resident of Montgomery County and was, and continues to be, similarly a constituent of Commissioner Gale.

23.     Plaintiff     D'Antonio     maintains     a     Facebook     account     at facebook.com/monica.dantonio.98, a Twitter account under the handle @monica_dantonio, and an Instagram account under the handle @monicadantonio15.

24.     Plaintiff Elaine Hannock is an adult individual residing in Marlborough Township, Montgomery County, Pennsylvania.

25.     At all times relevant to the allegations in this Complaint, Plaintiff Hannock was, and continues to be, a resident of Montgomery County and was, and continues to be, similarly a constituent of Commissioner Gale.

26.     Plaintiff Hannock maintains a Facebook account at facebook.com/Elaine.hannock, and a Twitter account under the handle @jewesss.

27.     Plaintiff Karen Hayman is an adult individual residing in West Norriton Township, Montgomery County, Pennsylvania.

28.     At all times relevant to the allegations in this Complaint, Plaintiff Hayman was, and continues to be, a resident of Montgomery County and was, and continues to be, similarly a constituent of Commissioner Gale.

29.     Plaintiff Hayman maintains a Twitter account under the handle @karenmhayman.

30.     Plaintiff Zak Hutchinson is an adult individual residing in Upper Moreland Township, Montgomery County, PA.

31.     At all times relevant to the allegations in this Complaint, Plaintiff Hutchinson was, and continues to be, a resident of Montgomery County and was, and continues to be, similarly a constituent of Commissioner Gale.

32.     Plaintiff Hutchinson maintains a Facebook account at facebook.com/zhutch87, a Twitter account under the handle @simp_for_marx, and an Instagram account under the handle @koopertrooper87.

33.     Plaintiff Elizabeth C. Brooks is an adult individual residing in Wyndmoor, Springfield Township, Montgomery County, PA.

34.     At all times relevant to the allegations in this Complaint, Plaintiff Brooks was, and continues to be, a resident of Montgomery County and was, and continues to be, similarly a constituent of Commissioner Gale.

35.     Plaintiff Brooks also maintains a place of business in Wyndmoor, Springfield Township, Montgomery County.

36.     Plaintiff Brooks maintains a Facebook account at facebook.com/Elizabeth.Brooks, a Twitter account under the handle @LizBrooksIBCLC, and/or an Instagram account under the handle @ecbrks.

37.     Defendant Joseph C. Gale is an elected Commissioner of Montgomery County, PA, and in his official capacity has a principal place of business at One Montgomery Plaza, Norristown, PA 19401.

38.     Defendant Friends of Joe Gale ("Friends") is an organization that assists Defendant

in the operation and maintenance of his social media accounts and has a principle place of business

at 628 Launfall Road, Plymouth Meeting, PA 19462.

39. At all times relevant to the Complaint, upon information and belief, Defendant Gale

and/or Defendant Friends, in their official capacities, maintained the Facebook, Twitter, and

Instagram profiles described *infra* paragraphs 78-116 herein.

40. At all times relevant to the allegations made in this Complaint, Commissioner Gale

and Friends acted under color of state law and therefore are subject to liability under 42 U.S.C. §

1983.

## JURISDICTION AND VENUE

41. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C.

§ 2201-2202, and 28 U.S.C. § 1367.

42. Venue is proper in this district court under 28 U.S.C. § 1391(b)(1), as

Commissioner Gale is a resident of this judicial district and all Defendants are residents of the state

in which the District is located.

43. In addition, venue is proper in this district court under 28 U.S.C. § 1391(b)(2), as a

substantial part of the events giving rise to this claim occurred in this District.

## FACTUAL ALLEGATIONS

**A.** **The Use of Social Media Accounts**

  **1.** **Twitter**

44. Plaintiffs repeat the allegations previously set forth in this Complaint and

incorporate them as though fully stated herein.

45. Twitter is a social media platform with more than 300 million active users

worldwide, including more than 100 million who use the service on a daily basis.

46. The platform allows "users" to publish short updates or messages of no more than

280 characters called "tweets," to "Retweet" or republish tweets uploaded or sent by other users, and to respond to the tweets of other users or the responses of tweets by other users.

47.     Tweets can, and often do, also include photographs, videos, links, or other content in addition to the 280-character limit.

48.     A person or entity becomes a Twitter "user" by creating an account on the platform. Each user selects a "handle," which is the manner in which the username is presented on the platform.  Each Twitter handle begins with an "@" character, normally followed by a series of letters and/or numbers selected by the user.

49.     Any time a user posts a Tweet, they are collected and aggregated together under the user's individual Twitter account known as a "Timeline."  All of a user's tweets are displayed in reverse chronological order, with the most recent tweets appearing at the top of the Timeline.

50.     A user's Twitter page also contains information that identifies the individual or entity that tweets from or operates the account.  The page may also include a biographical or other description of the user, a photograph or photographs of the user, the location from where the user established the account or chooses to be physically located in, and a collection of media, including but not limited to files, photographs, and videos, that the user has Tweeted or posted about.

51.     Any user who is able to view another public user's Twitter page is also able to view the other user's Timeline.

52.     A user may also elect to "Follow" another user.  This places all of the other user's Tweets, and tweets of any other users that the individual user has elected to follow, into a separate collection of tweets by other users called a "Feed."

53.     Twitter also aggregates any replies and retweets into a separate section of the user's profile called "Tweets & replies."  From this section, a user can view any other public user's tweets, replies, and retweets created by the user.

54.     A user may also "like" a tweet sent by another user by clicking on a heart icon depicted directly below an individual tweet.  All tweets that a user has liked are displayed in a separate section of the user's Twitter profile under the heading "Likes."

55.     By default, a Twitter profile is public and available for viewing for anyone on the platform.  However, a user may decide to limit who is able to see and interact with their tweets by "protecting" their Twitter profile or tweets.  Any tweets that are protected are not available for viewing for public users, and instead are viewable only by a select group of users who the user has permitted to view his, her, or its content.

56.     A Twitter user also has the ability to "block" another user from having any access to the user's profile.  A user who is blocked from the tweets of another user is prevented from seeing any tweets, replies, retweets, media, likes, or other content published to the user's Twitter account.  The blocked user is also prevented from even seeing the user's Twitter profile on the platform, and cannot use the platform to otherwise search for the user's tweets.

57.     If a user has been blocked from access to another user's tweets or profile, the user will see a message indicating that he/she/it has been blocked from following the other user's Twitter account and viewing tweets associated with it.

### 2.     Facebook

58.     Facebook is a social media platform that permits individuals or entities to post messages, updates, content, and other media to individual accounts for viewing by others.

59.     Facebook also allows frequent interaction by individual users with other Facebook accounts.

60.     In order to access Facebook, an individual must first create a Facebook "profile," where the person can choose to share information about themselves, their interests, hometown,

work and leisure pursuits, and/or updates.

61.     Following the creation of a Facebook profile, an individual may then create a Facebook "Page," which is often used by businesses, organizations, nonprofits, and, of particular relevance to this case, public figures and elected officials.

62.     Pages are often used by public figures and elected officials to connect with their constituents and to provide information relating to official government business, policymaking, constituent services, or appearances in the area.  These pieces of content or information are known as individual "posts."

63.     The person, or persons, who regularly publish posts to a Facebook page and maintain the same are known as "Administrators."

64.     The default setting for a Facebook page is for it to be publicly available, so that anyone with a Facebook account can have access to it and see the content posted.  However, a Page administrator can choose to limit access to a Facebook page only to those who he or she invites to see the content posted.  If access is limited, information shared on the page can be seen only by those who have been expressly granted access by the Administrator.

65.     In order to interact with a Facebook page, an Administrator may and often does choose to allow other Facebook profiles to "Like" or "Comment" upon one or more posts to the Page.

66.     An administrator may also block an individual Facebook profile's access to an otherwise publicly available page.  The administrator also has the ability to delete any comments from a publicly available page at his/her discretion.

67.     If a Facebook profile owner has been blocked from viewing a Page, the owner will not be able to view the Page from within his/her/its own Facebook account.

### 3. Instagram

68.     Instagram is a social media platform that allows its users to upload photographs or videos, often taken on users' mobile phones or devices, for other users to view.

69.     In order to access Instagram, an individual or entity must first sign up for an Instagram account.  Like Twitter, an Instagram user must first select a "handle," which also begins with an "@" character, normally followed by a series of letters and/or numbers selected by the user.

70.     A user can post a photograph or video to his, her, or its Instagram profile, and may also append a comment to the photograph or video.  Once uploaded, the photograph or video, and any associated comments posted by the user, become viewable within the Instagram user's profile.

71.     Other Instagram users can then interact with the user who posted the photograph or video by adding his, her, or its own comments to the post.

72.     All photographs and videos posted by an Instagram user are aggregated within the user's Instagram profile.  Like Twitter and Facebook, the default setting within Instagram is that each user's profile is publicly viewable.  Thus, any photographs or videos posted by the user, as well as any comments the user uploads and any comments other users append to the user's posts, are viewable by any other Instagram user.

73.     An Instagram user may decide to limit who is able to see and interact with their tweets by making his, her, or its profile "private."  This prevents other users from viewing the user's photographs, videos, and comments.  Another Instagram user can request to "follow" a private Instagram user, but will only be permitted to see the private user's Instagram content if the private user approves the request and permits the other user to do so.

74.     An Instagram user also has the ability to "block" another user from having any

access to the user's profile.  A user who is blocked is prevented from seeing any photographs, videos, comments, or other content posted to the other user's account.  The blocked user is also prevented from even seeing the user's Instagram profile on the platform, and cannot use the platform to otherwise search for the user's tweets.

75.    If an Instagram user has been blocked from access to another user's profile, the user will see a message indicating that he/she/it has been blocked from following the other user's account and viewing the content associated with it.

**B.    Commissioner Gale's Use of Social Media**

76.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

77.    In 2015, Gale was elected to the Board of Commissioners of Montgomery County, Pennsylvania for a four-year term.  He was sworn into office on January 4, 2016.

78.    In January of 2016, Gale and/or Friends established a Twitter account under the handle @JoeGalePA, which continues to exist today.

79.    Upon establishment of the account, and at all times until on or about June 7, 2020, Gale identified himself in his Twitter profile description as "Montgomery County Commissioner," referring to his elected title.

80.    The profile photo on the account shows Gale speaking from behind a podium bearing the official seal of Montgomery County, and the banner photo shows Gale shaking hands with certain individuals under the text "Joe Gale, Montgomery County Commissioner:" [1]

---

[1] All screenshots presented within paragraphs 78-96 of the Complaint are true and correct copies of tweets and/or content posted to the @JoeGalePA Twitter account, which can be found at https://twitter.com/joegalepa?lang=en.  This Web page was last accessed on June 25, 2020.



81.     The account states that Gale's location is "Norristown, PA," the same municipality where Gale's official government office as a Commissioner of Montgomery County is located.

⊙ Norristown, PA    🔗 JOEGALE.COM    📅 Joined January 2016
**507** Following    **2,199** Followers

82.     Upon information and belief, Gale's home residence is not in Norristown but rather is in Plymouth Meeting, PA.

83.     Almost instantly after being sworn into office, Gale and/or Friends began to use the @JoeGalePA account to communicate with his followers and constituents regarding his official duties as Commissioner of Montgomery County.

84.     Defendants continue to use the @JoeGalePA account to communicate with followers and constituents regarding Gale's official governmental duties and business, to give updates on County policies and procedures, and to share Gale's viewpoints on various political and governmental issues of the day.

85.     For example, on January 14, 2016, Gale and/or Friends tweeted a collage of photographs from Commissioner Gale's meeting with then-Secretary of Labor Thomas Perez, who was visiting Montgomery County:



86.     Upon information and belief, and based upon his presence in the photographs with the other two Commissioners of Montgomery County, Gale would not have been invited to meet Secretary Perez aside from his official capacity as Commissioner.

87.     Throughout his tenure as Commissioner, Gale and/or Friends continued to use @JoeGalePA to post content and updates regarding official Montgomery County government business.

88.     On March 5, 2020, Gale and/or Friends posted a photo of Gale with two other individuals and captioned it: "Excited to help build a foreign exchange student partnership between Germany and Montgomery County Community College."   Upon information and belief, Gale would not have been invited to participate in this program and event had it not been for his position as a Montgomery County Commissioner.



89.     Additionally, on March 10, 2020 Gale and/or Friends posted about a speaking engagement with the Montgomery County Association of Township Officials and advocated for "a strong bond between township and county government."



90.     Upon information and belief, Gale would not have been speaking at this event, nor posting about it, but for his position as a Montgomery County Commissioner.

91.     And, on April 27, 2020, Gale and/or Friends tweeted an announcement that the Small Business Administration was again accepting applications for the Paycheck Protection Program.  Included within the tweet was a video of Gale speaking from behind a Montgomery County Department of Public Safety podium:



92.     Gale and/or Friends also used @JoeGalePA to inform individuals who came to his page about Montgomery County policies and procedures being implemented.  On March 8, 13, and 20, 2020, Gale and/or Friends posted updates and information about COVID-19 in Montgomery County:







93.    Defendants also frequently used @JoeGalePA to express Gale's viewpoints regarding actions being taken by the other Commissioners of Montgomery County and other governmental departments and agencies in Montgomery County and elsewhere.  As the minority Commissioner during his four-year term, Gale frequently expressed his opposition to actions taken by the other two Commissioners on @JoeGalePA.

94.    On May 20 and 21, 2020, Gale and/or Friends tweeted about Gale's disagreement with a different Commissioner of Montgomery County on the issue of social distancing and wearing masks in the face of the COVID-19 pandemic.





95.     Additionally, on April 18, 2020, Gale and/or Friends used @JoeGalePA to express his dissatisfaction with the COVID-19 emergency orders issued by Pennsylvania Governor Thomas Wolf:



96.     As a public profile, Defendants' posts at @JoeGalePA were, and continue to be, available to any user Twitter users.  Defendants have not protected this account; anyone who wishes to follow @JoeGalePA can do so, and any user can locate @JoeGalePA on the Twitter platform.

97.     In the midst of his campaign for Commissioner, Gale, who had previously established a Facebook profile under his own name, and/or Friends created a Facebook Page called "Vote Joe Gale," which can be found at https://www.facebook.com/JoeGalePA.

98.     Ostensibly created in an effort to promote his candidacy for Commissioner, after his election in 2015, and inauguration to the position in January 2016, Gale and/or Friends nevertheless immediately began using Vote Joe Gale as his official public page to communicate with followers and constituents regarding Gale's official governmental duties and business, giving updates on County policies and procedures, and sharing Gale's viewpoints on various political and governmental issues of the day.

99.     Gale again identified himself as a "Montgomery County Commissioner" in this Facebook profile after it was created.

100.    The banner photograph for the page was, and remains, a photo of an inauguration ceremony in which Gale was sworn into his official role as Commissioner.  The page's identifying photograph also depicts Gale making remarks from a podium bearing the seal of Montgomery County, with several judges of the Court of Common Pleas of Montgomery County pictured behind him:[2]

---

[2] All screenshots presented within paragraphs 97-107 of this Complaint are true and correct copies of posts and/or content posted to the Vote Joe Gale Facebook page, which can be found at https://www.facebook.com/JoeGalePA.  This Web page was last accessed on June 25, 2020.



101.    The Facebook page is designated as belonging to a "Politician."

102.    Gale and/or Friends similarly used Vote Joe Gale to communicate official governmental information to Gale's constituents and members of the public.  Often, these official pronouncements mirrored those Gale and/or Friends would publish to the @JoeGalePA Twitter account, including a post on March 8, 2020 regarding the COVID-19 pandemic in Montgomery County:



103.     In addition, on May 4, 2020, Gale and/or Friends uploaded a post regarding the availability of Personal Protective Equipment (PPE) in Pennsylvania, above a photo of Gale speaking from behind a Montgomery County Department of Public Safety podium:



104.     And, on May 13, 2020, Gale and/or Friends posted information about in-person polling locations for Montgomery County residents, above a video of a news appearance in which Gale was identified as "Joe Gale, Montgomery County Commissioners:"



105. Like Twitter, Defendants have also frequently used Vote Joe Gale to publicize Gale's own viewpoints on political, social, and governmental issues in Montgomery County and elsewhere. On May 2, 2020, Gale and/or Friends posted commentary from Gale in which he criticized former Pennsylvania Governor Tom Ridge and advocated for a change in leadership in Pennsylvania:



106.    From its inception in 2015, Vote Joe Gale was set up as a public Facebook page, accessible to any Facebook user who wished to view it.  The posts Gale and/or Friends have made to Vote Joe Gale were, and continue to be, publicly available for any user to view and comment on who is not otherwise blocked, banned, or restricted from the page.

107.    Gale and/or Friends has never limited access to Vote Joe Gale.  It has always been a publicly available page, and users viewing content posted to the page have the ability to react to his posts and post their own comments regarding the same.

108.    Before the Pennsylvania primary election in 2019, Gale announced that he would be seeking re-election for another four-year term on the Board of Commissioners.  In March of 2019, Gale and/or Friends created the Instagram account @votejoegale, and began posting content to the account documenting his activities and positions.

109.    As he did with his Twitter and Facebook accounts, Gale identified himself (and

continues to identify himself) as a Montgomery County Commissioner in his Instagram profile photograph:[3]



110.    Gale and/or Friends quickly began using this account for more than campaign activities: Gale and/or Friends would soon begin posting photographs, messages, and videos to the @votejoegale account regarding Gale's official government business as an elected official.

111.    Indeed, the @votejoegale Instagram account virtually mirrored the content posted to his @JoeGalePA Twitter account and his Vote Joe Gale Facebook Page.  Gale and/or Friends regularly posted photographs, videos, and content regarding Gale's role as a Montgomery County Commissioner, his activities in that capacity, and his viewpoints on political, social, and economic issues surrounding the County and the United States.

112.    On February 25, 2020, Gale and/or Friends posted a photograph and an associated comment regarding a visit Gale made to A.W. Mercer, a business in Boyertown within Montgomery County:

---

[3] All screenshots presented within paragraphs 108-116 of this Complaint are true and correct copies of posts and/or content posted to the @votejoegale Instagram account, which can be found at https://www.instagram.com/votejoegale/. This Web page was last accessed on June 25, 2020.



113.     Gale and/or Friends similarly used the @votejoegale Instagram page to post regular content regarding Gale's viewpoints on political, social, and economic issues.  On April 26, 2020, Gale and/or Friends posted a photograph and associated comment in which Gale criticized Philadelphia Mayor Jim Kenney:



**The Inquirer**

## Philadelphia Mayor Jim Kenney dined in Chinatown to calm fears of the coronavirus



votejoegale · Follow  ···

**votejoegale** I truly wonder how many human lives Philadelphia Mayor Jim Kenney jeopardized with this PR stunt two months ago. Shame on Mayor Kenney for not only prioritizing political-correctness ahead of common-sense, but having the nerve to attack President Trump's response to the Chinese virus.

8w

114. As Defendants began uploading content in the same way that they had on Twitter and Facebook, many Instagram users began interacting with posts from the @votejoegale Instagram account, and many users posted comments regarding the posts.

115. At no time was the @votejoegale Instagram account made private, nor was access restricted at any time to certain Instagram users by permission. Rather, the content at all times

was, and continues to be, made publicly available to any Instagram user to view and comment upon.

116.    Gale and/or Friends regularly uploaded content concerning Gale's role as Montgomery County Commissioner to each of the above-referenced social media accounts and provided information to the public at large about his activities.  By so doing, Defendants created public fora for Montgomery County residents and Gale's constituents to participate in, and content for participants to interact about.

**C.    Defendants' Campaign to Restrict Speech on the Official Social Media Accounts**

117.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

118.    At all times from their inception, the aforementioned Twitter, Facebook, and Instagram profiles remained publicly viewable and free for consumption and comment by any users.

119.    However, Gale and/or Friends soon began a targeted campaign to silence constituents within Montgomery County and social media users as a whole who disagreed with Gale's viewpoints.  That campaign was, and continues to be, a direct and complete violation of the First Amendment rights of these users, and of those who wish to see the complete marketplace of ideas surrounding the content posted to Defendants' social media accounts.

120.    Upon information and belief, Gale and/or Friends began to block users from viewing the tweets at @JoeGalePA no later than the year 2017, just one year after being sworn into his elected position as a Montgomery County Commissioner.  Upon further information and belief, Gale and/or Friends began blocking individuals from viewing content associated with his Facebook profile in the same timeframe.

121.    The vast majority of social media users blocked by Gale and/or Friends were those

who posted comments or content expressing disagreement, disappointment, or opposition to viewpoints that Gale expressed. Gale and/or Friends continued to permit interaction on his Twitter and Facebook profiles with those users that expressed support, agreement, or admiration for his viewpoints or work as a Commissioner.

122. Not only did Gale and/or Friends individually target and block users who disagreed with them, but they also ensured that many negative comments or content posted to his Twitter or Facebook accounts were deleted, excised, or disposed of so that others could not see them. Gale and/or Friends selectively deleted a number of these comments so that users who would otherwise be able to view all content on his accounts were no longer able to see the comments expressing disagreement or opposition, and otherwise would not have been aware that such opposing viewpoints had been expressed.

123. Gale and/or Friends continued this campaign of suppression after beginning his Instagram account in 2019. They systematically blocked disfavored Instagram users from accessing the @votejoegale account, and regularly deleted comments from the account that Gale and/or Friends found unfavorable.

**D.     The June 1, 2020 Statement**

124. Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

125. Gale and/or Friends continued to post regular content regarding Gale's official activities as Montgomery County Commissioner from each of the aforementioned social media accounts throughout his first term as Commissioner, as well as after Gale's re-election in 2019 and swearing in for another term in January 2020.

126. On June 1, 2020, Gale and/or Friends posted the following statement on his @JoeGalePA Twitter account, Vote Joe Gale Facebook page, and @votejoegale Instagram

account:[4]



JOSEPH C. GALE
COMMISSIONER
BOARD OF COMMISSIONERS
MONTGOMERY COUNTY, PENNSYLVANIA

June 1, 2020

### PRESS STATEMENT: RIOTS & LOOTING IN PHILADELPHIA

What we saw this weekend in Philadelphia was not a protest - it was a riot. In fact, nearly every major city across the nation was ravaged by looting, violence and arson.

The perpetrators of this urban domestic terror are radical left-wing hate groups like Black Lives Matter. This organization, in particular, screams racism not to expose bigotry and injustice, but to justify the lawless destruction of our cities and surrounding communities. Their objective is to unleash chaos and mayhem without consequence by falsely claiming they, in fact, are the victims.

For years, our police men and women have been demonized and degraded by the radical left. As a result of this defamation and character assassination, as well as a complicit media constantly pushing the bogus narrative of systemic police brutality and white racism, law enforcement is afraid to do their job of protecting innocent people and their property.

In addition, too many Democrat mayors are sympathizers of these far-left radical enemy combatants. As a result, their misguided empathy has enabled a level of unfettered criminality never witnessed before in American history.

Sadly, Philadelphia Mayor Jim Kenney falls in this category of sympathetic Democrat mayors. And his handpicked Philadelphia Police Commissioner Danielle Outlaw seems to share her boss's sentiment. Frankly, the name Outlaw fits her to a tee.

This past weekend, I watched television coverage of police officers being ordered to stand down as the statue of Frank Rizzo was spray painted, lit on fire and attempted to be pulled down.

The only way to stop this vandalism and chaos is by allowing law enforcement to do their job of enforcing the law. Otherwise, so-called 'peaceful protests' end up escalating into into violence, arson and looting.

Police cannot continue to 'give space' to opportunists and lawbreakers. Because as they say, 'If you give an inch, they will take a foot.'

We need law-and-order. We need leaders who will uphold the laws they swore to defend when they placed their hand on the Holy Bible on inauguration day. The broken promises of failed Democrat mayors like Jim Kenney have led not just to broken windows, but a broken public trust that must be restored before more cities are shattered.

### ###

P.O. BOX 311 NORRISTOWN, PA 19404-0311
JOE@MONTCOPA.ORG

127.    Gale gave the statement the utmost appearance of an official proclamation in his capacity as a Montgomery County Commissioner.  He issued the statement on letterhead purportedly bearing the seal of Montgomery County, and under his official title as Montgomery County Commissioner.  *Id.*  The bottom of the statement also provided his official governmental address (P.O. Box 311, Norristown, PA 19401-0311), and his official governmental e-mail address ([joe@MontcoPa.org](mailto:joe@MontcoPa.org)).  *Id.*

---

[4] A true and correct copy of the statement is separately appended to this Complaint as **Exhibit "A."**  It is hereinafter often referred to in this Complaint as the "June 1 Statement."

128.     The June 1 Statement drew immediate condemnation not only from multiple users across social media, but also from multiple public officials, groups, and other elected officials. The supervisory boards of a number of governmental municipalities issued statements condemning Gale's statement and calling for him to resign.  Other groups and individuals, including, but not limited to, the Police Chiefs Association of Montgomery County, the Lower Merion School Board, and the mayors of nine separate municipalities within Montgomery County, similarly condemned the statement and disassociated themselves from his comments.

129.     The other two members of Montgomery County's Board of Commissioners voted to censure Gale at the Board of Commissioners' regular meeting on June 4, 2020, a meeting that also drew a number of public comments condemning the June 1 statement.

130.     The statement also attracted considerable media coverage in the greater Philadelphia community, and did not go unnoticed by state lawmakers in Harrisburg.   One lawmaker, Representative Joseph Webster of Montgomery County, announced plans to introduce a resolution calling for Gale's immediate impeachment, and then introduced the same into the Pennsylvania legislature on June 23, 2020.[5]

131.     The June 1 Statement also attracted widespread opposition on social media. Multiple users posted comments and content expressing their disagreement or disgust with the statement, and many others called for Gale's immediate resignation.

132.     Despite the widespread opposition to the content of his statement, Gale enjoys, and should enjoy, the right under the First Amendment to the United States Constitution and Article I, Section 7 of the Pennsylvania Constitution to express his own viewpoints.  **Plaintiffs herein do not seek to disturb that right**.  **As described *infra*, they instead request that Defendants**

---

[5] *See* Pennsylvania H.R. 920, Session of 2020, a true and correct copy of which is attached as Exhibit "B" and is accessible at:
https://www.legis.state.pa.us/CFDOCS/Legis/PN/Public/btCheck.cfm?txtType=PDF&sessYr=2019&sessInd=0&billBody=H&billTyp=R&billNbr=0920&pn=4004 (last visited June 25, 2020).

immediately cease infringing upon their identical rights.

    **E.    Gale and/or Friends Block the Individual Plaintiffs from Their Social Media Accounts**

        **1.    Plaintiff Deardorff**

133.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

134.    As a member of the public, and as one of Gale's constituents, Plaintiff Deardorff had and continues to have a vested interest in and regularly followed Gale's activities across the aforementioned social media accounts.

135.    Following Gale's publication of his June 1 statement, Plaintiff Deardorff viewed the statement on the Vote Joe Gale Facebook page, @JoeGalePa Twitter feed, and on the @votejoegale Instagram profile maintained by Defendants.

136.    In response to the post, on Tuesday, June 2, Plaintiff Deardorff responded to the statement by posting a comment to the post of the statement on the @votejoegale Instagram page that stated "Resign."

137.    Later, on June 2, 2020, Gale and/or Friends uploaded another post to Instagram in which Gale alleged that another Commissioner of Montgomery County had displayed hypocrisy by not observing social distancing requirements.

138.    In response to that post, Plaintiff Deardorff posted a comment that called the other Commissioner a "real leader" and again urged Gale to resign.

139.    On June 4, 2020, Gale and/or Friends posted a statement by Gale to Twitter which read:



140.    In response to that post, Plaintiff Deardorff posted a reply to the tweet that stated, "If you were really pro life [sic] and not just pro white fetus, you wouldn't be such a racist."

141.    True and correct copies of the above-cited posts by Deardorff  are attached as **Exhibit "C."**

142.    By June 4, 2020, Plaintiff Deardorff discovered that she had been blocked from all three of the social media accounts maintained by Defendants.

143.    Defendants' blocking of Plaintiff Deardorff from Gale's official Twitter, Facebook, Instagram profile prevents Plaintiff Deardorff not only from viewing Gale's own uploaded content, but also from viewing the comments and replies of other users and from participating in the feeds associated with this content.

### 2.      Plaintiff Oteri

144.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

145.    As a member of the public, and as one of Gale's constituents, Plaintiff Oteri had, and continues to have, a vested interest in and regularly followed Gale's activities across the aforementioned social media accounts.  Specifically, he followed the @JoeGalePA Twitter page

and the @votejoegale Instagram page through his own social media accounts.

146. Following Gale's publication of his June 1 statement, Plaintiff Oteri viewed the statement on the @votejoegale Instagram profile maintained by Defendants.

147. In response to the post, on Tuesday, June 2, Plaintiff Oteri responded to the statement by posting a comment to the post of the statement on the @votejoegale Instagram page that stated "Yet you choose to silence constituents by blocking them on social media or censoring their comments on your posts? #peoplebeforepolitics." A true and correct copy of the comment sent by Plaintiff Oteri is attached as **Exhibit "D."**

148. By June 4, 2020, Plaintiff Oteri discovered that he had been blocked from Gale's official Instagram profile maintained by Defendants.

149. Defendants' blocking of Plaintiff Oteri from Gale's official Instagram profile prevents Plaintiff Oteri not only from viewing Gale's own uploaded content, but also from viewing the comments and replies of other users and from participating in the feeds associated with this content.

### 3. Plaintiff SAVVY

150. Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

151. Plaintiff SAVVY is a wide-ranging periodical and publication that reports on events and activities within Montgomery County that counts hundreds of Montgomery County residents among its readership. As such, Plaintiff SAVVY has and continues to have a vested interest in and regularly followed Gale's activities across his social media accounts.

152. At all times relevant to the allegations in this Complaint, Caroline & Co Media LLC d/b/a SAVVY Main Line has been owned and operated by Caroline O'Halloran, who also controls Plaintiff's SAVVY's social media accounts.

153.    Following Gale's first election to the Board of Commissioners in 2015, O'Halloran interviewed Gale for the possibility of an article for Plaintiff SAVVY regarding his election and official duties.  Although Gale inquired of O'Halloran several times as to when he could expect to read the published article, O'Halloran chose not to publish it in SAVVY.

154.    Even after writing a separate article in May 2020 that reported on Gale's opposition to testing for COVID-19 exposure, Plaintiff SAVVY remained able to view Gale's official social media accounts without restriction.

155.    Following the publication of Gale's June 1 statement on his official @JoeGalePA Twitter feed, on June 2, 2020, Plaintiff SAVVY, through its own Twitter account, responded to the tweet by stating, "Please do your homework about the Black Lives Matter movement before drafting such statements.  You are woefully misinformed."    A true and correct copy of the comment sent by Plaintiff SAVVY is attached as Exhibit "E."

156.    After posting the response, Plaintiff SAVVY again attempted to view the @JoeGalePA Twitter account.  It was only after returning to the page that Plaintiff SAVVY saw that Defendants had blocked it from access the account.

157.    Defendants' blocking of Plaintiff SAVVY from Gale's official Facebook and Twitter accounts prevents Plaintiff SAVVY not only from viewing Gale's own uploaded content, but also from viewing the comments and replies of other users and from participating in the feeds associated with this content.

### 4.    Monica D'Antonio

158.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

159.    As a member of the public, and as one of Gale's constituents, Plaintiff D'Antonio had and continues to have a vested interest in and regularly followed Gale's activities across his

social media accounts. Plaintiff D'Antonio's interest in Gale's official activities and pronouncements from his social media accounts is even further enhanced by her status as an elected official in Norristown Borough.

160. On May 19, 2020, Gale and/or Friends posted a photo to the @JoeGalePA account depicting a meeting of the Board of Commissioners along with a comment from Gale in which he criticized another Commissioner as being "two faced" and "only practicing social distancing and mask wearing when on camera for press conferences." The photo was undated.



161. Through her own Twitter account, Plaintiff D'Antonio commented on this post saying, "Because it's coming from you, I'd like to see a date on that pic."



162.    Plaintiff D'Antonio also viewed the June 1 Statement on Gale's official Facebook and Instagram pages.

163.    After viewing the June 1 Statement, Plaintiff D'Antonio posted a comment to the Facebook post publishing the statement expressing her disagreement with the same.  Plaintiff D'Antonio posted a similar comment under the Instagram post where Defendants had published the June 1 Statement.

164.    Following her posts to Defendants' Facebook and Instagram accounts, Plaintiff D'Antonio attempted to view those accounts to see further discourse related to them.  It was only after returning to the Facebook and Instagram accounts that Plaintiff D'Antonio realized that Defendants had blocked her from access to the accounts.

165.    Defendants' blocking of Plaintiff D'Antonio from Gale's official Facebook and Instagram accounts prevents Plaintiff D'Antonio not only from viewing Gale's own uploaded content, but also from viewing the comments and replies of other users and from participating in the feeds associated with this content.

### 5.    Elaine Hannock

166.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

167.    As a member of the public, and as one of Gale's constituents, Plaintiff Hannock had and continues to have a vested interest in and regularly followed Gale's activities across his Twitter and Facebook accounts.

168.    Following the publication of Gale's June 1 Statement, Plaintiff Hannock posted a comment on June 3, 2020 directly under his publication on Facebook in which she expressed her opposition to the Statement.  That comment is no longer viewable, as, upon information and belief,

Defendants selectively deleted it.

169.    Also on June 3, 2020, Plaintiff Hannock replied to Defendants' publication of the June 1 Statement on Twitter with the identical language that she used to comment on Facebook. This reply also is no longer viewable, as, upon information and belief, Defendants selectively deleted it.

170.    After posting her response to the tweet publishing the June 1 statement, Plaintiff Hannock again attempted to view the Vote Joe Gale Facebook page and @JoeGalePA Twitter account.  It was only after returning to the page that Plaintiff O'Halloran saw that Defendants had blocked her from the account.

171.    Defendants' blocking of Plaintiff Hannock from Gale's official Facebook and Twitter accounts prevents Plaintiff Hannock not only from viewing Gale's own uploaded content, but also from viewing the comments and replies of other users and from participating in the feeds associated with this content.

**6.    Karen Hayman**

172.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

173.    As a member of the public, and as one of Gale's constituents, Plaintiff Hayman had and continues to have a vested interest in and regularly followed Gale's activities across his social media accounts.

174.    On or after June 1, 2020, Plaintiff Hayman viewed the publication of Gale's June 1 Statement on the @JoeGalePA Twitter account.

175.    On June 5, 2020, Plaintiff Hayman posted a reply to the tweet used by Defendants to publicize the June 1 Statement by expressing her disapproval of the Statement and her simultaneous approval of the actions of Gale's fellow Commissioners to censure him for making

the June 1 Statement.

176.     After posting her response to Gale's tweet publishing the June 1 statement, Plaintiff Hayman again attempted to view the @JoeGalePA Twitter account.  It was only after returning to the page that Plaintiff Hayman saw that Defendants had blocked her from the account.

177.     Defendants' blocking of Plaintiff Hayman from Gale's official Facebook and Twitter accounts prevents Plaintiff Hayman not only from viewing Gale's own uploaded content, but also from viewing the comments and replies of other users and from participating in the feeds associated with this content.

### 7.     Zak Hutchinson

178.     Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

179.     As a member of the public, and as one of Gale's constituents, Plaintiff Hutchinson had and continues to have a vested interest in and regularly followed Gale's activities across his social media accounts.

180.     Plaintiff Hutchinson had "followed" Gale's Twitter and Instagram accounts through his own profiles, and regularly checked the Vote Joe Gale Facebook page for updated content posted by Defendants, on or before June 1, 2020.

181.     One or shortly after June 1, 2020, Plaintiff Hutchinson viewed the June 1 Statement on the @JoeGalePA Twitter account.

182.     On June 3, 2020, Plaintiff Hutchinson posted a reply to the tweet publishing the June 1 Statement, in which he expressed his staunch opposition to the Statement and the message that it espoused.

183.     After posting his response to the tweet publishing the June 1 statement, Plaintiff Hutchinson again attempted to view the @JoeGalePA Twitter account.  It was only after returning

to the page that Plaintiff Hutchinson saw that Defendants had blocked him from the account.

184.    Plaintiff Hutchinson then attempted to view the @votejoegale Instagram account, only to learn at that time that Defendants had also blocked him from that account.

185.    Defendants' blocking of Plaintiff Hutchinson from Gale's official Facebook and Twitter accounts prevents Plaintiff Hutchinson not only from viewing Gale's own uploaded content, but also from viewing the comments and replies of other users and from participating in the feeds associated with this content.

### 8.    Elizabeth Brooks

186.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

187.    As a member of the public, and as one of Gale's constituents, Plaintiff Brooks had and continues to have a vested interest in and regularly followed Gale's activities across his social media accounts.

188.    Plaintiff Brooks viewed Gale's June 1 Statement and immediately desired to see the full complement of discourse and viewpoints among members of the public that flowed from it.

189.    Unlike the other Plaintiffs, Plaintiff Brooks has not, as of the filing of this Complaint, been blocked from viewing the aforementioned Twitter, Facebook, or Instagram accounts.  Plaintiff Brooks can view Gale's content uploaded to these platforms and can participate fully in discussion regarding the same.

190.    However, Plaintiff Brooks was, has been, and/or continues to be prevented from hearing speech of others opposing Gale's viewpoints, and any dialogue stemming from that speech, because Defendants have selectively deleted or removed comments or content posted by other users that they deem objectionable.

191.    As such, Plaintiff Brooks' First Amendment rights have been infringed by Gale

and/or Friends' distorting of the expressive forum in which Plaintiff Brooks as well as any other social media users that have not been blocked may participate in.

> **F.  Defendants' Continued Suppression**

192.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

193.    Defendants have shown no signs of relaxing their continued campaign of infringing upon the First Amendment rights of any social media users who disagree with Gale's viewpoints. Indeed, upon information and belief, they continues to restrict dozens, if not more, of social media users opposing his viewpoints from participation in the public fora that they created.  Similarly, Gale and/or Friends continue to distort and control the discourse emanating from Gale's public pronouncements as a Montgomery County Commissioner.

194.    Indeed, Gale has dedicated himself to ensuring that this widespread infringement will continue.  In a post shared publicly across all three of his social media profiles on June 7, 2020, Gale stated emphatically that "[a]gitators, anarchists and agent provocateurs will not be allowed to spew their lies and hate on my personal and campaign social-media platforms:"

195.    Defendants thus have re-dedicated themselves to violating the free speech rights of those who oppose them.  Gale's public statements confirm that those who might oppose him, or those who he singularly views as objectionable, will be entirely excluded from the public platforms that he and/or Friends created.  Gale has left little question that he will continue his campaign of several years to suppress speech that he finds unfavorable.

196.    Moreover, Gale and/or Friends continue to post Gale's viewpoints and activities as a Montgomery County Commissioner across all of his social media accounts, reaffirming his use of them under the color of his elected position.

197.    In a further attempt to curtail speech that he finds unfavorable, after publication of the June 1 Statement, Defendants sought to re-classify Gale's publicly available and official social media pages as his "private" social media accounts.

198.    At no point, however, has Gale ceased referring to himself as a Commissioner of Montgomery County, and at no time have Defendants ceased uploading content that pertains exclusively to his activities in his official capacity as a commissioner.

199.    Indeed, as recently as June 22, 2020, Gale and/or Friends posted to the Vote Joe Gale Facebook account a statement regarding Gale's recent inclusion in an article written in Newsweek Magazine, and quoted from the article that described Gale in his official title and set forth the viewpoints he expressed in the June 1 Statement:



200.    The attempted re-classification of the aforementioned social media platforms into "private" accounts is a thinly veiled attempt to legitimize Gale and/or Friends' own unconstitutional actions.  Defendants should not be able to escape the public fora that they created for free public speech and consumption merely by re-naming them.

**CAUSES OF ACTION**

**COUNT I – PLAINTIFFS v. DEFENDANTS**

**Violation of the First Amendment of United States Constitution under 42 U.S.C. § 1983**
**(Injunctive Relief)**

201.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

202.    The right of Plaintiffs to the free exercise of speech and/or to freedom of expression is protected under the First Amendment to the United States Constitution, which is applied to Plaintiffs under the Fourteenth Amendment to the United States Constitution.

203.    The establishment and/or maintenance of the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and/or the Instagram account @votejoegale constituted public fora under the United States Constitution.

204.    In blocking Plaintiffs Deardorff, Oteri, SAVVY, D'Antonio, Hannock, Hayman, and Hutchinson from access to the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and the Instagram account @votejoegale, and in restricting the access of Plaintiff Brooks to a complete picture of the fora by deleting and/or removing content and comments that Defendants view as inappropriate and/or objectionable, and at all times relevant to the facts and allegations set forth in this Complaint, Defendants act and continue to act under color of state law.

205.    Defendants' actions to block Plaintiffs Deardorff, Oteri, SAVVY, D'Antonio, Hannock, Hayman, and Hutchinson from access to the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and the Instagram account @votejoegale, and to restrict the access of Plaintiff Brooks to the marketplace of ideas in the fora by deleting and/or removing content and comments that Defendants view as inappropriate violates the First Amendment Rights of Plaintiffs because those actions:

      a.  impose a viewpoint-based restriction on the Plaintiffs' participation in one or more public fora;

      b.  impose a viewpoint-based restriction on the Plaintiffs' access to statements made by

Gale in his official capacity as a Commissioner of Montgomery County;

c. impose a viewpoint-based restriction on the Plaintiffs' ability to petition the government for redress of grievances;

d. impose a viewpoint-based restriction on Plaintiff Brooks' right to hear; and

e. were neither content-neutral, nor narrowly tailored to serve important governmental interests, and failed to permit ample alternative channels for communication of Plaintiffs' messages.

206.    Plaintiffs are likely to succeed on the merits of their claims, such that injunctive relief in their favor is warranted.

207.    Plaintiffs will suffer irreparable and immediate harm if injunctive relief is not granted, and have no clear and present remedy for Defendants' violation of their Constitutional rights, which will continue unfettered until enjoined by an appropriate Order of this Court.

208.    Defendants will not suffer irreparable harm if the injunctive relief requested is granted.

209.    The public interest strongly favors injunctive relief in this case.

### COUNT II – PLAINTIFFS v. DEFENDANTS
### Violation of Article I, Section 7 of the Pennsylvania Constitution

210.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

211.    The right of Plaintiffs to the free exercise of speech and/or to freedom of expression is protected under Article I, Section 7 of the Pennsylvania Constitution.

212.    The establishment and/or maintenance of the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and/or the Instagram account @votejoegale constituted public fora under the Pennsylvania Constitution.

213.    In blocking Plaintiffs Deardorff, Oteri, SAVVY, D'Antonio, Hannock, Hayman, and Hutchinson from access to the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and the Instagram account @votejoegale, and to restrict the access of Plaintiff Brooks to a complete picture of the fora by deleting and/or removing content and comments that Defendants view as inappropriate and/or objectionable, and at all times relevant to the facts and allegations set forth in this Complaint, Defendants act and continue to act under color of state law.

214.    Defendants' actions to block Plaintiffs Deardorff, Oteri, SAVVY, D'Antonio, Hannock, Hayman, and Hutchinson from access to the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and the Instagram account @votejoegale, and in restricting the access of Plaintiff Brooks to a complete picture of the fora by deleting and/or removing content and comments that Defendants view as inappropriate or objectionable violates the rights enjoyed by Plaintiffs under the Pennsylvania Constitution because their actions:

  a.  impose a viewpoint-based restriction on the Plaintiffs' participation in one or more public fora;

  b.  impose a viewpoint-based restriction on the Plaintiffs' access to statements made by Gale in his official capacity as a Commissioner of Montgomery County;

  c.  impose a viewpoint-based restriction on the Plaintiffs' ability to petition the government for redress of grievances;

  d.  impose a viewpoint-based restriction on Plaintiff Brooks' right to hear; and

  e.  were neither content-neutral, nor narrowly tailored to serve important governmental interests, and failed to permit ample alternative channels for communication of Plaintiffs' messages.

215.    Plaintiffs are likely to succeed on the merits of their claims, such that injunctive relief in their favor is warranted.

216.    Plaintiffs will suffer irreparable and immediate harm if injunctive relief is not granted, and have no clear and present remedy for Defendants' violation of their rights under the Pennsylvania Constitution, which will continue unfettered until enjoined by an appropriate Order of this Court.

217.    Defendants will not suffer irreparable harm if the injunctive relief requested is granted.

218.    The public interest strongly favors injunctive relief.

### COUNT III – PLAINTIFFS v. DEFENDANTS
**Violation of the First Amendment of United States Constitution under 42 U.S.C. § 1983 and/or Article 1 Section 7 of the Pennsylvania Constitution (Declaratory Relief)**

219.    Plaintiffs repeat the allegations previously set forth in this Complaint and incorporate them as though fully stated herein.

220.    An actual, immediate, justiciable, and present controversy exists between Plaintiffs on the one hand, and on Defendants on the other, concerning Plaintiffs' rights to participate in public debate by posting, responding, accessing, and commenting upon Gale's activities and posts on his official social media accounts.

221.    The controversy is ripe for determination and/or judicial decision, and declaratory relief is both necessary and appropriate so that the parties may know the legal obligations that govern their conduct.

**WHEREFORE**, Plaintiffs respectfully pray for judgment in their favor and against Defendants, and that the Court:

(a)    Grant injunctive relief to Plaintiffs requiring Defendants to unblock Plaintiffs Deardorff, Oteri, SAVVY, D'Antonio, Hannock, Hayman, and Hutchinson from, and/or restore access to, each of Defendant's social media accounts;

(b)    Grant injunctive relief to Plaintiffs requiring Defendants to immediately cease

deleting, excising, or disposing of comments or content uploaded to the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and the Instagram account @votejoegale;

(c)     Enter an order declaring that Defendants' actions to block Plaintiffs from access to the Twitter account @JoeGalePA, the Facebook page "Vote Joe Gale," and the Instagram account @votejoegale, and in restricting the access of Plaintiffs to a complete picture of the fora by deleting and/or removing content and comments that Gale singularly views as inappropriate violates the First Amendment to the United States Constitution and/or Article I, § 7 of the Pennsylvania Constitution;

(d)     Award Plaintiffs their costs and reasonable attorneys' fees under 42 U.S.C. § 1988;

(e)     Award Plaintiffs nominal, compensatory, and punitive damages in an amount exceeding the jurisdictional limits of this Court; and

(f)     Award Plaintiffs such other relief as it may deem necessary and proper.

**WALSH PANCIO, LLC**                                   **PHILIP PRESS LAW OFFICE**

BY: _____      BY:  __/s/ Philip Press_____
     Joseph P. Walsh, Esquire                             Philip Press, Esquire
     Michael J. Lyon, Esquire                              I.D. No. 306374
     I.D. No. 64352/306519                                 30 West Airy Street
     2028 North Broad Street                               Norristown, PA 19401
     Lansdale, PA  19446-1004


**MUDRICK & ZUCKER, P.C.**

BY: _____
     Adam Zucker, Esquire
     Samantha Harris, Esquire
     I.D. No.
     325 Sentry Parkway
     Building 5 West, Suite 320
     Blue Bell, PA 19422

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1 U.S. Government Plaintiff
- ❏ 2 U.S. Government Defendant
- ❏ 3 Federal Question *(U.S. Government Not a Party)*
- ❏ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ Pharmaceutical | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | Product Liability | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | Liability | | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| | | **PERSONAL PROPERTY** | | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 710 Fair Labor Standards Act | ❏ 861 HIA (1395ff) | ❏ 485 Telephone Consumer Protection Act |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 720 Labor/Management Relations | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 740 Railway Labor Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 196 Franchise | | | ❏ 751 Family and Medical Leave Act | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| | | | | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❏ 893 Environmental Matters |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | ❏ 791 Employee Retirement Income Security Act | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 895 Freedom of Information Act |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 896 Arbitration |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 950 Constitutionality of State Statutes |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ❏ 1 Original Proceeding
- ❏ 2 Removed from State Court
- ❏ 3 Remanded from Appellate Court
- ❏ 4 Reinstated or Reopened
- ❏ 5 Transferred from Another District *(specify)*
- ❏ 6 Multidistrict Litigation - Transfer
- ❏ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

- ❏ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:

JURY DEMAND: ❏ Yes ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)** **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)** **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.**  (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.** **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Gabrielle Deardorff, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| Joseph C. Gale, et al. | : | NO.  20-3172 |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants.  (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                  (   )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                  (   )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   (   )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                  (   )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                  (   )

(f) Standard Management – Cases that do not fall into any one of the other tracks.        (x )

| | | |
|---|---|---|
| 6/29/2020 | Michael J. Lyon, Esq. | Plaintiffs |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-368-8660 | 215-368-7990 | mike@walshpancio.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**Civil Justice Expense and Delay Reduction Plan**
**Section 1:03 - Assignment to a Management Track**

(a)     The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)     In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management. In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)     The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)     Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)     Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See §1.02 (e) Management Track Definitions of the**
**Civil Justice Expense and Delay Reduction Plan)**

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation. The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985. This term is intended to include cases that present unusual problems and require extraordinary treatment. See §0.1 of the first manual. Cases may require special or intense management by the court due to one or more of the following factors: (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition. It may include two or more related cases. Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues. See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

## DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: **Michael J. Lyon, Esq., 2028 North Broad Street, Lansdale, PA 19446**

Address of Defendant: **P.O. Box 311, Norristown, PA 19401**

Place of Accident, Incident or Transaction: **Montgomery County, PA**

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☐

I certify that, to my knowledge, the within case ☐ **is** / ☐ **is not** related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____   *Must sign here* _____   _____
                                              *Attorney-at-Law / Pro Se Plaintiff*                         *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.**     *Federal Question Cases:*                                   **B.**    *Diversity Jurisdiction Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts    ☐ 1. Insurance Contract and Other Contracts
☐ 2. FELA    ☐ 2. Airplane Personal Injury
☐ 3. Jones Act-Personal Injury    ☐ 3. Assault, Defamation
☐ 4. Antitrust    ☐ 4. Marine Personal Injury
☐ 5. Patent    ☐ 5. Motor Vehicle Personal Injury
☐ 6. Labor-Management Relations    ☐ 6. Other Personal Injury *(Please specify):* _____
☑ 7. Civil Rights    ☐ 7. Products Liability
☐ 8. Habeas Corpus    ☐ 8. Products Liability – Asbestos
☐ 9. Securities Act(s) Cases    ☐ 9. All other Diversity Cases
☐ 10. Social Security Review Cases             *(Please specify):* _____
☐ 11. All other Federal Question Cases
      *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, **Michael J. Lyon** _____, counsel of record *or* pro se plaintiff, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☑ Relief other than monetary damages is sought.

DATE: **06/29/2020** _____   *Sign here if applicable* _____   **306519**
                                          *Attorney-at-Law / Pro Se Plaintiff*                   *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*



JOSEPH C. GALE
COMMISSIONER
BOARD OF COMMISSIONERS
MONTGOMERY COUNTY, PENNSYLVANIA

June 1, 2020

## PRESS STATEMENT:  RIOTS & LOOTING IN PHILADELPHIA

What we saw this weekend in Philadelphia was not a protest - it was a riot.  In fact, nearly every major city across the nation was ravaged by looting, violence and arson.

The perpetrators of this urban domestic terror are radical left-wing hate groups like Black Lives Matter. This organization, in particular, screams racism not to expose bigotry and injustice, but to justify the lawless destruction of our cities and surrounding communities. Their objective is to unleash chaos and mayhem without consequence by falsely claiming they, in fact, are the victims.

For years, our police men and women have been demonized and degraded by the radical left.  As a result of this defamation and character assassination, as well as a complicit media constantly pushing the bogus narrative of systemic police brutality and white racism, law enforcement is afraid to do their job of protecting innocent people and their property.

In addition, too many Democrat mayors are sympathizers of these far-left radical enemy combatants. As a result, their misguided empathy has enabled a level of unfettered criminality never witnessed before in American history.

Sadly, Philadelphia Mayor Jim Kenney falls in this category of sympathetic Democrat mayors. And his handpicked Philadelphia Police Commissioner Danielle Outlaw seems to share her boss's sentiment. Frankly, the name Outlaw fits her to a tee.

This past weekend, I watched television coverage of police officers being ordered to stand down as the statue of Frank Rizzo was spray painted, lit on fire and attempted to be pulled down.

The only way to stop this vandalism and chaos is by allowing law enforcement to do their job of enforcing the law. Otherwise, so-called 'peaceful protests' end up escalating to into violence, arson and looting.

Police cannot continue to 'give space' to opportunists and lawbreakers. Because as they say, 'If you give an inch, they will take a foot.'

We need law-and-order. We need leaders who will uphold the laws they swore to defend when they placed their hand on the Holy Bible on inauguration day.  The broken promises of failed Democrat mayors like Jim Kenney have led not just to broken windows, but a broken public trust that must be restored before more cities are shattered.

###

P.O. BOX 311 NORRISTOWN, PA 19404 - 0311
JOE@MONTCOPA.ORG

PRINTER'S NO. 4004

### THE GENERAL ASSEMBLY OF PENNSYLVANIA

# HOUSE RESOLUTION

No. 920 Session of 2020

INTRODUCED BY WEBSTER, BRIGGS, HILL-EVANS, HANBIDGE, NEILSON, KINSEY, KENYATTA, ULLMAN, SANCHEZ, DALEY, LEE, FIEDLER, CIRESI, SCHWEYER AND RABB, JUNE 23, 2020

REFERRED TO COMMITTEE ON JUDICIARY, JUNE 23, 2020

### A RESOLUTION

1  Impeaching Joseph C. Gale, Montgomery County Commissioner, for
2    misbehavior in office.
3    BE IT RESOLVED, That Joseph C. Gale, Montgomery County
4  Commissioner, be impeached for misbehavior in office and that
5  the following be exhibited to the Senate:
6    On June 1, 2020, Joseph C. Gale issued a press statement
7  under the Seal of the County of Montgomery in which he, without
8  evidence or cause, disparaged and defamed the Black Lives Matter
9  movement by declaring them "terrorists" seeking to "justify the
10  lawless destruction of our cities and surrounding communities,"
11  despite the fact that they represent peaceful and civil
12  protestors seeking redress for four centuries of grievances,
13  including racially-motivated oppression, rape, exploitation and
14  murder.
15    Joseph C. Gale did make these inflammatory and derisive
16  statements despite the overwhelmingly peaceful and civil nature
17  of protests throughout this Commonwealth, the United States and

1  at least 17 countries around the world in support of the civil

2  rights of people of color.

3     Joseph C. Gale has demonstrated by this and subsequent

4  statements his contempt for the people of Montgomery County and

5  his deliberate unwillingness to uphold its values of decency,

6  morality, respectability, civility, equality and unity.

7     Joseph C. Gale engaged in a potentially unlawful and

8  distinctly shameful use of a public office and public resources

9  for no legitimate governmental purpose, utilizing his office to

10 engage in and promote libelous and unsupported hate speech for

11 his own political gain, as evidenced by the prominent display of

12 his statement of June 1, 2020, on his personal campaign website.

13    Joseph C. Gale used the County Seal and masthead bearing the

14 words "Board of Commissioners, Montgomery County, Pennsylvania"

15 to legitimize racist rhetoric, thereby deliberately and falsely

16 implying that his statements were an official statement of the

17 Montgomery County government.

18    Joseph C. Gale was formally censured by the County of

19 Montgomery on June 4, 2020, for his "hateful, divisive and

20 false" statements.

21    Joseph C. Gale is the subject of a petition calling for his

22 immediate resignation which has, as of June 9, 2020, more than

23 80,000 signatures; and has been the subject of numerous peaceful

24 public protests calling for his immediate resignation.

25    Joseph C. Gale expressed views which law enforcement

26 officials in Montgomery County have described as increasing

27 danger for law enforcement officers, undermining their authority

28 by disrespecting a large proportion of his constituents

29 and unilaterally declaring that those seeking justice are

30 "terrorists."

1    Joseph C. Gale has failed in his duty to provide words of

2    unity, calm and compassion during this difficult time following

3    the killing of George Floyd by a police officer, and has instead

4    deliberately endangered his constituents through the use

5    of language that incites violence and division.

6    Joseph C. Gale has abused his position to promulgate and

7    promote racist and ignorant comments that have legitimized and

8    increased fear and hatred of people of color within Montgomery

9    County.

10    Joseph C. Gale abused his position via an unwarranted

11    assumption of authority to attack and undermine elected

12    officials in Philadelphia County, a county over which he has no

13    jurisdiction or oversight.

14    Wherefore, Commissioner Joseph C. Gale is guilty

15    of impeachable offenses warranting removal from office and

16    disqualification to hold any office or trust in

17    this Commonwealth.

18    The House of Representatives hereby reserves the right and

19    ability to exhibit at any time hereafter further Articles of

20    Impeachment against Commissioner Gale, to reply to any answers

21    that Commissioner Gale may make to any Articles of Impeachment

22    which are exhibited and to offer proof at trial in the Senate in

23    support of each and every Article of Impeachment which shall be

24    exhibited by them.

June 1, 2020

## PRESS STATEMENT: RIOTS & LOOTING IN PHILADELPHIA

What we saw this weekend in Philadelphia was not a protest - it was a riot. In fact, nearly every major city across the nation was ravaged by looting, violence and arson.

The perpetrators of this urban domestic terror are radical left-wing hate groups like Black Lives Matter. This organization, in particular, screams racism not to expose bigotry and injustice, but to justify the lawless destruction of our cities and surrounding communities. Their objective is to unleash chaos and mayhem without consequence by falsely claiming they, in fact, are the victims.

For years, our police men and women have been demonized and degraded by the radical left. As a result of this defamation and character assassination, as well as a complicit media constantly pushing the bogus narrative of systemic police brutality and white racism, law enforcement is afraid to do their job of protecting innocent people and their property.

In addition, too many Democrat mayors are sympathizers of these far-left radical enemy combatants. As a result, their misguided empathy has enabled a level of unfettered criminality never witnessed before in American history.

Sadly, Philadelphia Mayor Jim Kenney falls in this category of sympathetic Democrat mayors. And his handpicked Philadelphia Police Commissioner Danielle Outlaw seems to share her boss's sentiment. Frankly, the name Outlaw fits her to a tee.

This past weekend, I watched television coverage of police officers being ordered to stand down as the statue of Frank Rizzo was spray painted, lit on fire and attempted to be pulled down.

The only way to stop this vandalism and chaos is by allowing law enforcement to do their job of enforcing the law. Otherwise, so-called 'peaceful protests' end up escalating to into violence, arson and looting.

Police cannot continue to 'give space' to opportunists and lawbreakers. Because as they say, 'If you give an inch, they will take a foot.'

We need law-and-order. We need leaders who will uphold the laws they swore to defend when they placed their hand on the Holy Bible on inauguration day. The broken promises of failed Democrat mayors like Jim Kenney have led not just to broken windows, but a broken public trust that must be restored before more cities are shattered.

### ###



P.O. BOX 311 NORRISTOWN, PA 19404 - 0311
JOE@MONTCOPA.ORG

          

**45 likes**

**votejoegale** Montgomery County Commissioner Joe Gale... more

View all 183 comments

**gabriellemaryrn** Resign 

**gabriellemaryrn** Resign 

**gabriellemaryrn** Resign 

19 hours ago



LIVE

Watch IGTV Video

3:06  53°

SIGN UP FOR NEWS UPDATES: NBC10.COM/NEWSLETTERS

    

**166 views**

**votejoegale** Exposing Arkoosh's Social-Distancing Hypocrisy · Long before big city Democrat mayors conveniently stopped enforcing social-distancing protocols to allow far-left rioters, looters and arsonists to congregate in congested urban areas, it was hypocrite Democrat Montgomery County Commissioner Val Arkoosh who would choose on a whim when it was appropriate to sit or stand six feet part.

View all 4 comments

**gabriellemaryrn** She is a real leader. You are a racist. Resign.  

3 hours ago



6:31 PM · 6/4/20 · Twitter for iPhone

**13** Retweets **27** Likes

   

 **Abby Deardorff** @gabriellemar... · 32s ⌄
Replying to @JoeGalePA

If you were really pro life and not just pro white fetus, you wouldn't be such a racist.





**46 views**

**votejoegale** I Will Not Be Silenced · The radical left can scream, riot and smear me, but they cannot silence me. My message of truth has been heard far and wide. In silent prayer and spoken words, I will continue to fight against the evil of abortion because All Lives Matter and every innocent unborn child deserves the chance to breathe.

**ohhhhhteeee** Yet you choose to silence constituents by blocking them on social media or censoring their comments on your posts? 🤔 #peoplebeforepolitics

 Add a comment...  



Montgomery County Commissioner Joe Gale

PRESS STATEMENT: RIOTS & LOOTING IN PHILADELPHIA



**JOSEPH C. GALE**
COMMISSIONER
BOARD OF COMMISSIONERS
MONTGOMERY COUNTY, PENNSYLVANIA

June 1, 2020

**PRESS STATEMENT: RIOTS & LOOTING IN PHILADELPHIA**

What we saw this weekend in Philadelphia was not a protest - it was a riot. In fact, nearly every major city across the nation was ravaged by looting, violence and arson.

The perpetrators of this urban domestic terror are radical left-wing hate groups like Black Lives Matter. This organization, in particular, screams racism not to expose bigotry and injustice, but to justify the lawless destruction of our cities and surrounding communities. Their objective is to unleash chaos and mayhem without consequence by falsely claiming they, in fact, are the victims.

For years, our police men and women have been demonized and degraded by the radical left. As a result of this defamation and character assassination, as well as a complicit media constantly pushing the bogus narrative of systemic police brutality and white racism, law enforcement is afraid to do their job of

The Philadelphia Inquirer and 9 others

◯ 1.8K          �17 2.1K          ♡ 752          ↑



**caroline o'halloran**
@SAVVYMainLine

Replying to @JoeGalePA @PhillyInquirer and 9 others

Please do your homework about the Black Lives Matter movement before drafting such statements. You are woefully uninformed.

2:36 PM · Jun 2, 2020 · Twitter for iPhone

**1** Like

◯          �17          ♡          ↑